In the Matter of the Estate of GEORGE F. BAKER, Deceased.

Surrogate's Court, New York County, April 30, 1940.

*White & Case [Joseph M. Hartfield, David Ferguson* and *Windsor B. Putnam* of counsel], for the petitioners.

*Curtis, Belknap & Webb [James F. Curtis* of counsel], for Edith Kane Baker, individually.

*Wilson, Huntington & Lord [Paul E. Lord* of counsel], for the Society of the New York Hospital.

*John J. Bennett, Attorney-General [Robert P. Beyer, Assistant Attorney-General,* of counsel], for the State of New York.

*Thomas I. Sheridan,* special guardian for infant remaindermen.

FOLEY, S. An important and interesting question involving a very large sum of money is presented for determination in this accounting proceeding. By his will and his codicils, Mr. Baker specifically bequeathed to those whom he described as his " Charity Trustees," 7,500 shares of the stock of the First National Bank of the City of New York valued at death at $12,000,000.

After the execution of his will and before the making of his two codicils he pledged these shares with a bank as collateral for the payment of a loan in the sum of $7,500,000. The loan was unpaid at the time of his death. His executors satisfied it out of the general assets of his estate upon their belief that it was his intention to bequeath the stock to charity, free from the lien of the loan. The special guardian of the infant beneficiaries of the residuary trusts has filed objection to the payment of the loan out of the general assets, because of the consequent imposition of its burden upon the interests of his wards.

The questions thus presented are:

(1) Were the executors justified in paying the loan out of the general assets of the estate, thus permitting the charity trustees to receive, free and clear, the stock specifically bequeathed to them?

(2) Did Mr. Baker intend by the terms of his will and codicils, as amplified by the extrinsic evidence, that the securities should pass to charity free from the burden of the loan, or subject to it?

Mr. Baker left a gross estate of the approximate value of $38,000,000. As above stated, the value, as of his death according to the account, of the shares specifically bequeathed to charity was $12,000,000 (based upon market value less blockage discount). Aside from these shares, therefore, his gross general assets aggregated $26,000,000. If the bank loan of $7,500,000 is to be charged against the specifically bequeathed securities, the trust for charity will be reduced from $12,000,000 to $4,500,000.

If, on the other hand, it was properly paid by the executors out of the general assets, the total of the residuary trusts will be reduced to a value (as of death) of approximately $5,500,000. This result is based upon the amounts set forth in the intermediate account. The large deductions from gross assets (not specifically bequeathed) aggregated $20,500,000 and included inheritance taxes, debts actually paid (including the amount of the loan here involved), administration expenses and other items. These sums are tentative estimates only, since the ascertainment of the ultimate total of the residuary trusts must necessarily await the final accounting of the executors.

Mr. Baker died on May 30, 1937. His three executors in this proceeding seek the judicial settlement of their first intermediate account. His will was executed on August 28, 1935. Two codicils to it were later executed by him. While the will is lengthy, his plan for the distribution of the estate may be briefly summarized.

He gave his personal and household effects to his wife.

He created a charitable trust and named as his "Charity Trustees" the same persons who were his executors. At present they are his widow, a friend and banking associate, Alexander C. Nagle, and the First National Bank of the City of New York. In the will he gave to them 5,000 shares of the stock of the First National Bank as the sole asset of the charitable trust. He identified the shares by their specific certificate numbers. He directed his trustees to pay over the income of the fund or any portion of the principal " to and among such corporations organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals." He made alter-

native gifts to two named charitable institutions in the event that such primary purposes should be held subject to taxation. Since his primary gifts to charity were not made subject to taxation by subsequent legislation, the secondary disposition is now academic.

He directed the division of the residue of his estate into two equal parts in trust for the benefit of his wife as primary life tenant and with secondary life estates for his two sons respectively.

The remainders of these trust funds were given in varying contingencies for the benefit of his lineal descendants.

By his first codicil executed July 16, 1936, he made a simple change by which he gave to his charity trustees an additional 2,500 shares of the stock of the same bank described by a certificate number with directions that they be held by them under the above-stated terms contained in article fifth of the will " in manner as though such additional Twenty-five hundred shares had originally been provided for and given, devised and bequeathed under that article fifth of my said last will and testament."

He stated in his first codicil that in every other respect he ratified, confirmed, redeclared and republished his will.

By his second codicil he made another simple change. His friend, Jackson E. Reynolds, one of the persons named as an executor and as a general and charity trustee in the will, had requested that he be eliminated from appointment to those capacities. Mr. Baker complied with that request and canceled the appointment " with great reluctance."

He again, by an appropriate clause in the second codicil, ratified, confirmed, redeclared and republished his original will and the first codicil.

At the outset of their contentions the executors urge that Mr. Baker's plain intent was to free the shares of stock specifically given to charity from any liability for the loan. They argue that his intent is clearly revealed in his three testamentary instruments. The Attorney-General of the State, under his statutory duty of enforcing charitable gifts, has appeared in the proceeding and urges a similar determination.

The search for intent is the first and foremost canon of the construction of a will and all other rules of interpretation are subordinate to it. When ascertained, it must prevail. (*Matter of Buechner*, 226 N. Y. 440, 444.) It is the controlling factor, provided it does not conflict with public policy or some prohibition of statute. When declared in a lawful manner and having a legal purpose it " has paramount potency and cannot be thwarted or nullified." (*Eidt* v. *Eidt*, 203 N. Y. 325, 328.)

In the endeavor to find intent, the surrounding circumstances attendant upon the transactions involved, the financial position of

the testator, the nature and *quantum* of the assets disposed of and the contemplated objects of bounty are of importance. (*Matter of Smith*, 254 N. Y. 283; *Matter of Martin*, 255 id. 248; *Matter of Frasch*, 125 Misc. 381; affd., 216 App. Div. 797; affd., 245 N. Y. 174; *Furniss* v. *Cruikshank*, 230 id. 495, 501; *Matter of McArdle*, 203 App. Div. 324.)

With these rules for guidance, the sequence of events here is particularly a matter of primary consideration. In the year 1932 Mr. Baker established and in 1934 he made additions to a trust for the benefit of his wife, of securities having an original value of $12,000,000. At his death the assets within the trust were worth approximately $16,000,000. They included 5,500 shares of the stock of the First National Bank.

In August, 1935, in the period of less than a month before the execution of his will, he created four separate trusts for the benefit of each of his children and their issue. The securities conveyed then aggregated in value $18,000,000. They were worth at the date of his death about $27,000,000. They included 6,350 shares of the stock of the same bank.

On August 28, 1935, he made his will in which he gave the 5,000 designated shares of the bank stock to his charity trustees. In the month of March, 1936, there came due Federal gift taxes in the sum of $7,100,000 upon the trusts created in the prior year for the benefit of his children and their issue. In order to meet this payment and on March 16, 1936, he borrowed from the Chase National Bank upon his individual note $7,500,000, for which he pledged as collateral the certificates for the 7,500 shares of bank stock, which included the 5,000 shares specifically bequeathed to charity in his will, and the 2,500 shares similarly bequeathed by his subsequent first codicil executed on July 16, 1936.

On January 14, 1937, he made his second codicil eliminating one of the executors and trustees and republishing his will and first codicil.

After his death the executors paid out of the general assets the loan for which the shares were pledged. From that transaction arose the issue as to whether the amount of the loan was thus properly paid, or whether, as contended by the special guardian, the loan constituted a lien upon the pledged securities and should have been satisfied out of the proceeds of their sale.

The charitable trust contained no assets other than the specifically bequeathed bank stock.

We are required to examine the will and codicils with the objective of first ascertaining the intent and, secondly, effectuating it if it be lawful.

Mr. Baker had owned in all 22,500 shares of the bank, which represented about one-fifth of its total capitalization. They are presently retained in his *inter vivos* trusts and testamentary estate. There is strong indication in his will that he planned to perpetuate, as far as possible, the retention of these shares with the object of retaining their voting power as a controlling interest for his family in the affairs of the bank. His father had been one of the founders of that institution and had been its dominant head as chairman of the board of directors for many years. In the latter period of the father's lifetime the testator was vice-chairman of the board. Upon his father's death he became chairman and retained that position until his death. There is expressed in the fourth paragraph of his will sentiment showing his attachment to the financial institution, mingled with business advice to his sons. It reads: " In addition to substantial property that my sons now have, I am bequeathing to them by far the largest proportion of my property not bequeathed to charity, as well as giving them an active voice in the administration of such of my property as is bequeathed to charitable purposes. I want them to realize that they are inheriting not wealth alone, but great obligations and responsibilities. Their grandfather helped to organize the First National Bank, and more than any other man, deserved the credit for the stability, earning power and public confidence attained by the Bank under his leadership for nearly sixty-eight years. It has been my effort to maintain this standard. I have every confidence that my two sons will make the same effort."

There is a further mandate in the will that the stock of the bank be withheld from sale by the following direction to his charity trustees: " I strongly express my wish that none of said shares of stock be sold except as may be necessary for the purpose of paying taxes as hereinbefore provided or necessary and proper administration expenses and charges of said trust." Moreover, the will contains explicit expression of " his desire and intention " that the value of the shares specifically bequeathed should not be included " in determining the amount of the estate or inheritance taxes levied or assessed against my estate." That direction negatived any inference that Mr. Baker, by his own act, in placing the shares of stock as collateral for the loan, intended that the source of payment should be found in the proceeds of the sale of almost one-half of the shares which would have been necessary to satisfy the loan.

Further evidence of his intention to perpetuate control of the shares of the bank stock in his descendants is found in the plan for the selection of additional trustees, by his direction that each of

his sons and each of their sons should become charity trustees when each attained majority.

There are other expressions of intent in the will, when construed as a whole, which strongly evidence a purpose that the loan should be paid from the general assets rather than from the specifically-bequeathed stock.

The terms of the first codicil again support Mr. Baker's purpose to immunize the additional shares specifically bequeathed to charity from liability for the loan. All the shares of the stock given by the will and the first codicil had been pledged between the dates of the execution of these two instruments. At the time that he made the latter instrument these securities had been made part of the collateral of his loan obtained from the Chase National Bank. He knew at the time of executing his first codicil that the stock had been subjected to the lien. He stated in that instrument in his gift of the additional 2,500 shares represented by a single certificate designated by number that they were given to his charity trustees in trust under the same terms and conditions contained in his will. He then added the significant phrase " in manner as though such additional * * * shares had originally been provided for and given, devised and bequeathed under " the specific article of his will. At the time of the making of the will the shares therein given to charity were free and clear of any burden. By the antecedent reference in the first codicil a similar intent that the additional shares given in it should pass free from any burden is plainly shown.

This conclusion is further supported by the events leading up to the execution of the final draft of the first codicil which occurred four months after the making of the loan. In the preparation of that instrument it appears that he originally planned to give 5,000 additional shares of the bank stock to charity. The first draft of the codicil contained a bequest of that number. His attorney called to his attention, by letter, the possible violation of section 17 of the Decedent Estate Law by a gift of more than half of his estate to charity. A written statement of his total assets and net worth were presented to Mr. Baker and to his attorney. The excess over the permissible half by the contemplated legacy of the 5,000 shares additional to the same number given to charity in his will was thus revealed. Mr. Baker stated that he wanted to give as much as the law permitted to his charity trustees. He said: " I certainly want to give all I can to charity." The draft of the codicil was then changed by reducing the bequest to an additional 2,500 shares in order to bring his total gifts within the permissible statutory maximum limit for a charitable bequest. At that time

the additional shares were part of the collateral of the loan. It is abundantly clear from these transactions and declarations that he did not want the shares to be sold or applied to the payment of the loan.

Independent of the intention expressed in the language of the will and codicils, there is ample support in the extrinsic evidence, both oral and documentary, that Mr. Baker intended to free the shares of stock specifically bequeathed for charitable purposes from any liability for the payment of the loan for which they were pledged. Counsel for the executors have with commendable zeal and research developed and arrayed this testimony. The documentary evidence is particularly convincing that he selected the bank stock as collateral purely for convenience. At the time of the placement of the loan he was possessed of readily salable government, State and municipal securities which he could have sold to pay his gift tax liability due the Federal government in March of 1936, or which he could have used as collateral for the loan. His financial assistants in charge of his personal affairs prepared at his request, in January, 1936, a written analysis of three plans for obtaining the funds to pay the imminent Federal gift tax liability due in March of that year. The first alternative contemplated the sale of sufficient tax-free bonds. The second alternative provided for the liquidation of the tax liability in part by the sale of such bonds and in part by the placement of a loan. The third alternative provided for payment of the tax liability wholly out of the proceeds of a loan. He selected the last of these alternatives undoubtedly because, as shown in the document, it presented the greatest saving in income taxes.

The testimony of Mr. Winthrop W. Aldrich, who represented the Chase National Bank in the negotiations with Mr. Baker, is impressive upon this phase. It shows that Mr. Baker had informed him of the large block of government securities owned by him. Mr. Aldrich said at the time that his own bank did not care to take large blocks of the stock of another bank as collateral. Mr. Baker told him that he wanted " to put up " the First National Bank stock with the understanding that he would liquidate the loan out of his government securities and " get back the bank stock." He had insisted upon the insertion in the collateral note, which was to fall due on March 16, 1941, of a specific provision that it could be paid " in whole or in part at any time or from time to time at the borrower's option."

With the very large amount of government, State and city securities, aggregating over $12,000,000 in value, which Mr. Baker possessed at the time of the procurement of the loan, he could have

furnished ample collateral of that nature to secure it. The extrinsic evidence shows that he finally decided, as a matter of pure mechanical convenience and ease in handling, to use as collateral the three certificates of his First National Bank stock rather than the bulky and cumbersome block of the bonds of varying issues of a very large number. Convenience and simplicity in a business transaction thus governed the actual pledge rather than any deliberate intent to choose and subject the certificates of his bank shares to the burden of the loan.

Mr. Baker had amply provided for his wife and children and lineal descendants by *inter vivos* trusts which aggregated in value at the time of his death the sum of $43,000,000. In addition he had given them very substantial financial benefits by way of life estates and remainder interests in a large share of his testamentary estate. His total benefactions to them approximate almost $50,000,000.

There is evidence in the record that he contemplated transferring in his lifetime the shares specifically bequeathed in his will and codicils to a foundation which was to be formed under the authority of special legislation to hold them for the same charitable purposes or to a trustee for similar objects. If Mr. Baker completed either one of these plans by the absolute transfer of the securities free from the loan, of course no question of their subjection to any lien that he had contracted would have arisen.

The surrogate, accordingly, holds upon the terms of the will and codicils, and independently thereof, by such terms as supported by the extrinsic evidence, that Mr. Baker intended that the 7,500 shares of the stock of the First National Bank should pass to his charity trustees immune from any lien for the payment of the loan for which they were pledged.

Because of the absence of any legal impediment, and in view of his declared purpose, his generous charitable donation should be given force and effect without diminishment.

There remains for consideration the possible legal effect upon the will and codicils of the provisions of section 38 of the Decedent Estate Law or of the terms of section 250 of the Real Property Law.

I am of the opinion that the former section has no application here. It reads:

" § 38. Charge or incumbrance not a revocation. A charge or incumbrance upon any real or personal estate, for the purpose of securing the payment of money, or the performance of any covenant, shall not be deemed a revocation of any will relating to the same estate, previously executed; but the devises and legacies therein

contained, shall pass and take effect, subject to such charge or incumbrance."

The section is found in the arrangement of the statute along with other sections dealing with the revocation of wills. (Dec. Est. Law, §§ 34–41.) It was originally enacted in 1829 in the Revised Statutes (R. S. pt. 2, chap. VI, tit. 1, § 42) and was intended to repeal the common-law rule applying to implied revocations of specific devises and bequests. As stated in the explanatory note of the revisers, its purpose was " to guard against implied revocations by a mortgage or other incumbrance, which have been held to operate in that way in law, but not in equity. It is at least deemed useful to have the law uniform in all the courts." (Fowler's Dec. Est. Law, p. 275 *et seq.*, and p. 549 *et seq.*) The section states that a charge placed upon personal property for the purpose of securing the payment of money shall not be deemed a revocation of any will " previously executed."

In the pending proceeding the execution of the second codicil and even the execution of the first codicil, at a time subsequent to the making of the loan upon the original 5,000 shares of specifically-bequeathed stock, make the terms of the section inapplicable to the specific bequests. As to the additional 2,500 shares, the section could have no relevancy because they were bequeathed by an instrument executed after the imposition of the loan.

In section 2 of the Decedent Estate Law the term " will " is defined to include a codicil. " The effect of a codicil is to republish the will and make it speak again from the new date." (CARDOZO, J., in *Matter of Brann*, 219 N. Y. 263, 268.) Differently stated by Chief Judge POUND in *Matter of Greenberg* (261 N. Y. 474), " It may be conceded that the will and the codicils are separate papers so that one may stand although the others fall, but when all are admitted to probate as the last will and testament of the testator the effect of the codicils is to republish the will and make it speak from the new date in so far as it is not altered or revoked by the codicil " (p. 477).

The facts here, therefore, differ from those in *Matter of Tabbagh* (167 Misc. 156). There the will was executed before the making of the loan upon the securities specifically bequeathed, and section 38 of the Decedent Estate Law was held to apply with the consequence that the securities passed subject to the lien. Here the will was republished by codicils executed subsequent to the imposition of the lien of the loan and the terms of the section in no wise apply to any part of the specific bequests.

Likewise, in the pending proceeding, because of the expressed intent of the testator, other cases which deal with the duty of a

specific legatee to take the personal property *cum onere,* or subject to the charge or lien upon it, do not apply. In one of these authorities the articles bequeathed were in France. The court required the recipient of the specific legacy to pay the storage and transportation charges without the right of exoneration from the general estate. (*Matter of Columbia Trust Co.,* 186 App. Div. 377, 382.) In another, Surrogate HENDERSON held that the specific legatee of pawned jewelry was required to pay the pledge free from any contribution from the assets of the general estate. (*Matter of Adams,* 159 Misc. 827.) In these cases the property specifically bequeathed passed as of the date of death of the testator and subject to the existing charges, which were not founded upon a personal promise of the testator.

Finally, consideration has been given to the relevancy here of the provisions of section 250 of the Real Property Law. That section relates to the devise of real property subject to a mortgage and requires the devisee to " satisfy and discharge the mortgage out of his own property, without resorting to the executor * * * unless there be an express direction in the will of such testator, that such mortgage be otherwise paid."

Unlike the provisions of section 38 of the Decedent Estate Law, that section compels the specific devisee to take the real property burdened by the mortgage even if the will is executed subsequent to the placement of the mortgage. Do its terms apply to a specific bequest of personalty?

In several cases in the Court of Appeals, certain provisions of the Real Property Law have been assimilated and applied to personal property. (*Mills* v. *Husson,* 140 N. Y. 99, 104; *Matter of Kimberly,* 150 id. 90; *Overheiser* v. *Lackey,* 207 id. 229, 236.) No reported decision has, however, specifically held that the provisions of section 250 apply to personalty, within the rule of assimilation.

The section has been strictly limited to a mortgage even in its application to real estate. It required an amendment made by the Legislature in 1937 to extend it to forms of liens other than a mortgage upon the real estate. (Laws of 1937, chap. 75; *Matter of Pinkney,* 257 App. Div. 985; Report of Law Revision Commission [1937], pp. 960, 980.)

But even if it were extended in scope to apply to personalty, it could have no relevancy here because of the finding of the surrogate that there is an expressed intention of the testator in the will and codicils for the payment of the loan out of the general assets of the estate on the specifically devised shares. It is within the power of a testator to direct that a mortgage on specifically devised real property should be paid out of his personalty. Section 250 of the Real Property Law so provides.

In *Duke of Cumberland* v. *Codrington*, decided in 1817 (3 Johns. Ch. 229, 272), Chancellor KENT stated: " The result of the cases seems to be, that as to wills, the testator may, by express directions, charge such an encumbrance upon his personal assets, or, even without express words, he may do it by dispositions and language. that are tantamount; as if, for instance, the continuance of the charge primarily on the land would be repugnant to some of the provisions in the will, and defeat them."

Subsequent decisions have restated that rule. (*DeGraaf* v. *Cochrane*, 21 App. Div. 381; *Matter of Brundage*, 101 Misc. 528; affd., 186 App. Div. 722; modfd. on other grounds, 226 N. Y. 691; *Matter of Storey*, 134 Misc. 791, 799.)

To the student of improvements in the law of inheritance, it would appear that the Legislature might well enact a section of the Personal Property Law with provisions similar to those contained in section 250 of the Real Property Law so that in the absence of any express direction in the will, a specific bequest, like a specific devise, should pass subject to a charge or lien upon it whether imposed before or after the execution of a will. Such an enactment would eliminate the question as to the effect of a *subsequently*-executed will and would accord with the modern trend of treating the disposition of realty and personalty in the same manner. The distinction between them is archaic and is without logical or practical foundation. England adopted the improvement in section 35 of the Administration of Estates Act of 1925. Under it any interest in property, real or personal, which at the time of the testator's death is charged with the payment of money whether by way of loan, mortgage, equitable lien for unpaid purchase money, or otherwise, passes to the designated recipient subject to the payment of the charge.

Submit supplemental decree on notice construing the will and settling the account accordingly. That decree shall restate the express reservation of the rights of the infant son and the descendants of the testator to assert a partial intestacy under a possible violation of the provisions of section 17 of the Decedent Estate Law, which prohibit a testamentary gift to charitable corporations or purposes of more than one-half of the gross assets of the estate, less debts. The original decree of probate contained that reservation. Since the account of the executors here is intermediate only, the final determination of such question should properly be made in the final accounting proceeding of the executors.