FRED G. GRUEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GEORGE J. GRUEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 107242, 107243. Promulgated November 24, 1942.

*Irving G. Bieser, Esq.*, and *Zivel B. Niden, C. P. A.*, for the petitioners.

*Owen W. Swecker, Esq.*, for the respondent.

136

OPINION.

VAN FOSSAN, *Judge:* The first issue for our consideration is whether the gifts in question were made in 1935 or 1937. Petitioners contend that the gifts were effected in 1935 because it was then that the rights of the donees as third party beneficiaries of the Katz and Gruen contract became vested. Respondent argues that the gifts were not completed until 1937, since it was not until that year that the donees received delivery of the property which was the subject of the gifts.

The elements essential for a valid gift are to be found in the following statement from *Edson* v. *Lucas*, 40 Fed. (2d) 398:

\* \* \* "To constitute a valid gift inter vivos, there must be a gratuitous and absolute transfer of the property from the donor to the donee, taking effect immediately and fully executed by a delivery of the property by the donor, and an acceptance thereof by the donee."

An examination of the facts in these proceedings shows that the Katz and Gruen contract in 1935 did not, of itself, contain the requirements indicated in the above quotation as necessary for a completed gift in that year. Consummation of the gifts was conditioned on the occurrence of certain events. A certain amount of debentures of the company had to be retired at or before their maturity and the net earnings of the company had to reach certain amounts before the donees would become entitled to the stock. Such conditions precedent are themselves sufficient to prevent the contract from constituting a gift in 1935. See *Lorraine Manville Gould Dresselhuys*, 40 B. T. A. 30.

Moreover, in 1935 the donors retained control over the right to receive the stock in that they had to be actively associated with the company and had to be using their best efforts to make the company's operations successful at the time the obligation to deliver the stock accrued. Thus the donors could have prevented the stock from ever

being delivered to their children simply by disassociating themselves from the company. See *Sanford's Estate* v. *Commissioner*, 308 U. S. 39; *Doris Bond Sherman*, 41 B. T. A. 898.

We conclude that the gift was consummated in 1937, when the donees actually received the property.

The second issue concerns the proper value to be placed on the gift in 1937. Respondent, in determining the value of the gift, considered the $80,000 payment received by the donees from Strelsin as part of the gift. Petitioners contend that the stock, not the $80,000 payment, was the subject of the gift and, therefore, only the value of the former should be considered in computing the value of the gift.

As to the $80,000 ($40,000 as to each petitioner) received by the children of petitioners from Strelsin, we are unable to agree with the respondent. The gifts by petitioners to the children consisted of stock. They were consummated in June 1937 and the gifts became effective and taxable at that time. Though the petitioners were, for a reason which does not appear, made parties to the Strelsin contract, the contract was one for the sale of stock when received, and the payment was a payment on account of such contract for the purchase of stock. The $80,000 never belonged to petitioners and never passed through their hands. Strelsin was not making a gift to anybody—he was paying for stock bought—nor did petitioners, who had no rights in the $80,000 and who were never entitled to receive the same, make a gift thereof to their children. As we have observed, the gifts consisted solely of stock. We are not in these cases concerned with the income tax results of the Strelsin contract under which the $80,000 was paid. Respondent's determination is reversed to the extent that it depends on the inclusion of the $80,000 in the gifts of the petitioners.

There remains the question of the proper value to be placed on the class B nonvoting preferred stock. The respondent determined the value to be $3 per share and assessed a gift tax on that basis. Petitioners contend that the stock did not have a fair market value greater than $1.10 a share.

The evidence presented does not demonstrate that the respondent's determination was incorrect. We have not overlooked the fact that there was one sale of class B nonvoting preferred stock made by a bank at a nominal figure of 80 cents on the dollar. However, that sale was made as a part of the bank's disposition of its entire holding of securities in the company and, hence, does not afford an accurate criterion of an independent value placed on such stock by the bank. On the other hand, occasional sales of common stock, into which the

class B nonvoting preferred stock was convertible, were made at prices ranging from approximately $6.50 to $7.50 a share during a period of five months preceding the delivery of the stock to the children, thus indicating an even greater value than that determined by the Commissioner. Taking the entire record into consideration, the evidence does not warrant our disturbing the finding of the Commissioner in this respect.

Petitioners further contend that the value of the gifts should be reduced by amounts paid by the donees in satisfaction of their transferee liability for income taxes due from petitioners. Respondent has not attempted to refute this contention, either at the hearing or on brief.

The liability for the income tax resulting from the receipt of the stock in question arose at the time of such receipt. See *Otto C. Botz*, 45 B. T. A. 970, wherein stockholders of a corporation to whom corporate assets had been distributed were held liable as transferees for income taxes of the corporation arising on a gain from a sale or exchange of assets for cash. The corporation was on a calendar year basis and the sale or exchange occurred on August 1, 1933. We stated therein as follows:

> * * * The debt for the tax, basing the present proceedings, arose on August 1, 1933, when the sale or exchange by the Botz Co. occurred, giving rise to the tax.

Furthermore, the insolvency of the donors at the time of the transfer and their consequent inability to pay the income tax resulting from the transfer were sufficient to shift the tax liability to the donees. In *Lehigh Valley Trust Co., Executor*, 34 B. T. A. 528, we said:

> Under the decisions of the Board and the courts the distribution of assets does not of itself mean the incurring of transferee liability. It is only when such distribution makes the taxpayer insolvent or leaves him with insufficient assets to pay the tax due that the liability comes into existence. *Helen Dean Wright*, 28 B. T. A. 543, and cases there cited. Here the parties have stipulated that the distributions by the administrator rendered the estate of Jonas George insolvent and without funds or assets with which to pay the tax. We must assume that the stipulation was carefully drawn and couched in language chosen with full realization of the meaning of the words used. Thus we have no alternative to holding that petitioners are liable as transferees.

It is our opinion, therefore, that the value of the gifts should be decreased by the amount of income taxes paid by the donees as transferees of the donors. See *United States* v. *Klausner*, 25 Fed. (2d) 608.

*Decisions will be entered under Rule 50.*