William E. MURRAY, Perry M. Sample
and Leila M. Atwood, Executors of the
Estates of Oliver S. Donaldson and Jennie R. Donaldson

v.

The UNITED STATES.

Nos. 548–79T, 549–79T and 550–79T.

United States Court of Claims.

Aug. 25, 1982.

James R. DeGiacomo, Boston, Mass., attorney of record, for plaintiffs. Stephen T. Dean, Orlando, Fla., Norman A. Sugarman, and Harlan Pomeroy, Washington, D. C., of counsel.

Donald H. Olson, with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant. Theodore D. Peyser, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, MARKEY,* Chief Judge, and BENNETT, Judge.

ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge.

The court is called upon to decide three claims for the refund of federal estate and gift taxes. In No. 548–79T, plaintiffs seek the refund of federal gift taxes in the amount of $2,721,262 on behalf of the estate of Jennie R. Donaldson. In No. 549–79T, as representatives of the estate of Oliver S. Donaldson, plaintiffs petition for the recovery of federal estate taxes of $4,499,168.26 and assessed interest of $760,112.90. Finally, in No. 550–79T, again on behalf of the estate of Oliver S. Donaldson, plaintiffs seek the refund of federal gift taxes of $1,360,631. The actions were consolidated by order entered August 27, 1981, by the trial judge. This court has jurisdiction under 28 U.S.C. § 1491 (Supp. IV 1980).

* Chief Judge, U. S. Court of Customs and Patent Appeals, sitting by designation.

Both parties have filed dispositive motions for summary judgment. For the reasons stated below, plaintiffs' motion for summary judgment is denied and defendant's motion for summary judgment is granted.

## I

The subject disputes stem from a complicated series of estate planning transactions taken by Oliver S. Donaldson (Oliver). Oliver owned 76,875 shares of stock in International Business Machines Corporation (IBM) which he had acquired during the 1920's. His wife, Jennie R. Donaldson (Jennie), also owned a considerable number of IBM shares in her own name. The Donaldsons were married for 48 years, had no children and lived frugally. Oliver had no next of kin or heirs at law. Jennie had several nephews and nieces and their descendants. Both Oliver and Jennie were residents of New York State.

In February of 1968, the Donaldsons, who were then in their nineties, met William E. Murray, a New York attorney, who subsequently drafted for Oliver a revocable *inter vivos* trust agreement dated February 8, 1968, to which was conveyed all shares of Oliver's IBM stock, which had, as the result of a 100-percent stock dividend earlier that year, doubled in number and were valued at approximately $37,500,000. At the same time, Jennie's IBM shares were transferred to a separate personal revocable trust for her benefit, No. T–984B.

On May 11, 1968, Oliver's trust agreement was amended to create an irrevocable trust for two of Jennie's female relatives and their issue (No. T–984C, the 1968 Family Trust). The 1968 Family Trust held 51,250 shares of IBM stock and constituted a completed gift for federal gift tax purposes. However, no gift tax was paid by Oliver at that time. Oliver's original trust continued in existence and held the remaining 102,500 shares of IBM stock.

A new trust agreement was drawn up on November 29, 1969, which revoked all of the provisions of the February 8, 1968 trust agreement except for the 1968 Family Trust and Jennie's personal trust (No. T–984B). This new trust agreement divided the 102,500 shares of IBM stock into five separate trust accounts as follows: (1) No. T–1030, a revocable trust funded with 80,000 of the IBM shares providing an income interest for life to Oliver, with the trustees having unlimited discretion to invade the principal for Oliver's benefit (Oliver's trust); (2) No. T–1031, an irrevocable charitable trust containing 9,500 IBM shares (the Oliver S. and Jennie R. Donaldson Charitable Trust); (3) No. T–1032, a revocable trust for the benefit of one of Jennie's male relatives, funded with 3,500 IBM shares; (4) No. T–1033, a revocable trust for the benefit of another of Jennie's male relatives, funded with 3,000 IBM shares; and (5) No. T–984C, a revocable "addition" of 6,500 IBM shares to the 1968 Family Trust. (Collectively, Nos. T–1032, T–1033 and the T–984C addition are the 1970 Family Trusts.) The 1970 Family Trusts were revocable "during the lifetime of the Donor, and prior to January 2, 1970." They were also subject to pro rata assessment for the payment of "all estate, inheritance, succession, transfer or other death taxes imposed by any jurisdiction whatsoever upon any property wheresoever situated forming part of the gross taxable estate of the Donor, whether passing under his Will or otherwise, including interest and penalties thereon * * *."

According to the terms of Article SECOND of the November 29, 1969 trust agreement, upon Oliver's death, if Jennie survived him, the assets of Oliver's trust were to be divided into two equal shares. "Share A" was to provide an income interest for life to Jennie, with the trustees having unlimited discretion to invade the principal for her benefit, and reserving to her a testamentary power of appointment. It was Oliver's stated intention that Share A "secure for his estate the marital deduction authorized by the Internal Revenue Code of 1954." Article SECOND also provided that "all provisions of [the] Trust Agreement [were] to be construed so as not to impair or defeat the right of the estate of the Donor to such marital deduction." "Share B," subject to

the payment of certain debts and expenses of Oliver's estate, was distributable for the benefit of the Oliver S. and Jennie R. Donaldson Charitable Trust.

Article SECOND further provided that if Jennie did not survive Oliver, then all of the assets of Oliver's trust were to go to Share B. Under these circumstances, Article NINTH of the November 29, 1969 trust agreement required that all of Oliver's debts, the expenses of his estate and any gift taxes (including any interest and penalties) be paid from Share B. No estate or other death taxes were to be paid therefrom, as these taxes were to be paid from the assets of the 1970 Family Trusts. If these assets were insufficient to pay all of Oliver's death taxes, Article FIFTH of the 1968 Family Trust authorized payment of any death taxes apportionable thereto from the trust assets. However, this trust contained no provisions concerning the payment of Oliver's gift taxes or of the debts and expenses of his estate.

If Jennie survived Oliver, Article NINTH explicitly stated that upon Oliver's death, no gift taxes were to be paid from Share B. The trust agreement, in that event, contained no express provision for the payment of gift taxes.

Oliver died on January 2, 1970, at the age of 97, without ever having exercised his power of revocation over any of the revocable trusts. Consequently, the 1970 Family Trusts became completed gifts for federal gift tax purposes at that time, with an aggregate fair market value of $4,100,159. Moreover, pursuant to Article SECOND of the November 29, 1969 trust agreement, Oliver's trust was divided into two separate trusts, each containing 40,000 shares of IBM stock. Each trust was valued at $12,793,777 on audit by the Internal Revenue Service (IRS).

At the time of his death, Oliver had accrued a gift tax liability of over $12,000,000. This amount included approximately $523,000 in gift taxes and interest owed from gifts made prior to 1968, $8,785,668 in gift taxes and interest due from the creation of the 1968 Family Trust, and $2,721,262 arising on January 1, 1970, when the 1970 Family Trusts became irrevocable.

Jennie decided to treat one-half of these gifts as her own pursuant to section 2513(a)(1) of the Internal Revenue Code of 1954,[1] thereby becoming jointly and severally liable for the entire gift tax. 26 U.S.C. § 2513(d) (1970). In the following months, she undertook to satisfy this liability by requesting, at various times, that the trustees of Share A distribute to her a sufficient sum to enable her to make payment of the taxes and interest due.

In particular, on March 10, 1971, Jennie notified the trustees of Share A that she had executed and was prepared to file gift tax returns on behalf of herself and on behalf of Oliver's estate for the gifts made during 1970 and requested that adequate funds be released to pay the gift taxes due and owing thereon. In response, the trustees made a distribution to Jennie of $1,386,493 from Share A (an amount equaling $1,360,631 in gift taxes for the gifts made by Oliver in 1970 and $25,862 for gifts made by Jennie in 1970) and also a distribution of $1,360,631 from her separate revocable trust. On March 25, 1971, Jennie and plaintiffs, acting as executors under Oliver's will, filed separate gift tax returns for the 1970 gifts, each reporting $1,360,631 in gift taxes as due and payable. These gift tax returns, together with payment of

---

1. Section 2513(a)(1) provides:

"A gift made by one spouse to any person other than his spouse shall, for the purposes of this chapter, be considered as made one-half by him and one-half by his spouse, but only if at the time of the gift each spouse is a citizen or resident of the United States. This paragraph shall not apply with respect to a gift by a spouse of an interest in property if he creates in his spouse a general power of appointment, as defined in section 2514(c), over such interest. For purposes of this section, an individual shall be considered as the spouse of another individual only if he is married to such individual at the time of the gift and does not remarry during the remainder of the calendar quarter."

All statutory references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise indicated.

$2,721,262, were received by the IRS on March 30, 1971.

In total, over a period of 18 months, the trustees of Share A distributed to Jennie $10,712,369.80, of which $10,648,265.80 represented gift taxes and interest for gifts made by Oliver between 1963 and 1970, and $64,104 represented gift taxes and interest incurred by Jennie for gifts made by her personally.

Oliver's estate tax return was filed with the IRS on April 2, 1971, reflecting a taxable estate of less than zero. Accordingly, the estate reported that no federal estate tax was due or payable. After a period of negotiation and proposed adjustments, by letter of February 14, 1974, the IRS determined that Oliver had died with a taxable estate of $20,308,683 and thus owed a net federal estate tax of $4,499,168.26. In part, this assessment resulted from the reduction of the marital deduction claimed by the estate by $12,009,646, an amount equaling the gift taxes and interest owed by Oliver at his death. The assessed tax, along with interest of $760,112.90, was subsequently paid by plaintiffs on behalf of Oliver's estate.

Jennie died on July 31, 1973. On March 13, 1974, plaintiffs, as executors of her estate, filed a claim for the refund of the gift taxes paid with respect to the 1970 Family Trusts. At the same time, plaintiffs filed a similar refund claim on behalf of Oliver's estate. The legal basis of both claims was that the gifts had no value when made since the assets comprising the 1970 Family Trusts were encumbered for the payment of Oliver's estate tax liability.

Plaintiffs also filed a claim for refund on April 1, 1974, with respect to the federal estate taxes paid by Oliver's estate, arguing that the estate was entitled to the marital deduction originally taken. Each of these claims was disallowed on March 21, 1979, leading to the actions filed in this court.

## II

We first address the estate tax question. Simply stated, we must examine the validi-ty of the IRS adjustment which reduced the marital deduction allowable to Oliver's estate by the amount of his liability for gift taxes and interest. Plaintiffs urge that we restore the full marital deduction originally claimed on Oliver's estate tax return, contending that the entire amount passing to Jennie under Share A, the marital trust, was properly includible in computing the amount of the deduction.

The governing statute, 26 U.S.C. § 2056(a) (1970) (since amended), allows an estate tax deduction for "an amount equal to the value of any interest in property which passes * * * from the decedent to his surviving spouse." However, in determining the value of the interest in property passing to the surviving spouse for which such a deduction is allowed—

> where such interest or property is encumbered in any manner, or where the surviving spouse incurs any obligation imposed by the decedent with respect to the passing of such interest, such encumbrance or obligation shall be taken into account in the same manner as if the amount of a gift to such spouse of such interest were being determined. [Section 2056(b)(4)(B).]

Defendant argues that since the only source for payment of Oliver's gift tax liability was the assets funding Share A, these assets were "encumbered" for that purpose and the marital deduction must be reduced accordingly.

The basic policy behind the marital deduction is to provide equivalent estate tax treatment to estates composed of noncommunity property with those which include community property. *Northeastern Pa. Nat'l Bank & Trust Co. v. United States*, 387 U.S. 213, 219, 87 S.Ct. 1573, 1576, 18 L.Ed.2d 726 (1967). Generally, the effect of the deduction is to permit property to be taxed in two stages, at the death of the decedent and at the death of the surviving spouse.[2] Consequently, the deduction is

---

**2.** Or, should the surviving spouse make a gratuitous *inter vivos* transfer, as a gift. *Estate of*

*Mittleman v. Commissioner*, 522 F.2d 132, 134 (D.C.Cir.1975).

generally restricted to the property interest that will be includible in the surviving spouse's gross estate. *United States v. Stapf*, 375 U.S. 118, 128, 84 S.Ct. 248, 255, 11 L.Ed.2d 195 (1963). Section 2056(b)(4)(B), which reduces the value of the marital deduction where the property interest passing to the surviving spouse is subject to an encumbrance or other obligation, reflects this concern with the eventual taxability of the marital deduction property. *See also* Treas.Reg. § 20.2056(b)–4(a) (1958), which limits the marital deduction to the net value of the bequest to the surviving spouse. Where this property is not includible in the gross estate of the surviving spouse, there should be no marital deduction therefor. *Estate of Wycoff v. Commissioner*, 506 F.2d 1144, 1148 (10th Cir. 1974), *cert. denied*, 421 U.S. 1000, 95 S.Ct. 2398, 44 L.Ed.2d 667 (1975). As this court recently noted in *Colwell v. United States*, 230 Ct.Cl. ——, 676 F.2d 550 (1982):

> [T]he marital deduction is determined by "the value of any interest in property" passing from the decedent to the surviving spouse. Unless the amount of the encumbrances was deducted in valuing that interest, the marital deduction would be based upon a fictitious valuation of the property passing. The value of property transferred is not its unencumbered value but only its net value. [230 Ct.Cl. at ——, 676 F.2d at 554.]

■ We have reviewed the record with these principles in mind. Because we find that the assets of Share A were subject to being diverted for the payment of Oliver's gift taxes, the value of the marital deduction taken by his estate was properly reduced by this amount.

■ At the time of Oliver's death, he had an unpaid gift tax liability in excess of $12,000,000. Section 2502(d) clearly states that "the tax imposed by Section 2501 shall be paid by the donor." Where the donor dies prior to the payment of that tax, the amount of the tax becomes a debt due from the decedent's estate and his executor or administrator is responsible for its payment out of the estate. Treas.Reg. § 25.2502–2 (1958). Thus, in this case, primary responsibility for payment shifted to Oliver's executors, who were directed by the regulations to make use of available estate assets to satisfy the outstanding tax liability. And, under New York law, they were required to pay the debts of the decedent to the extent of the assets of the estate before paying testamentary dispositions, or else risk personal liability for any unpaid debt. *In re Moose's Will*, 241 A.D. 329, 272 N.Y.S. 140 (1934).

However, because of the nature of Oliver's prior transfers and the various limitations placed upon the use of the transferred property, the executors were severely restricted in their choice of which estate assets to use to pay this debt. None of the so-called "family trusts" was an available source for payment. The 1968 Family Trust was an independent entity and the trustees thereof had a legal duty to the beneficiaries to deal at arm's length with third parties, such as the executors of Oliver's estate. So, while the trustees had the power under Article FIFTH to pay any apportionable estate taxes, they had been given no authority to pay any other obligation of Oliver. The executors could not look to this trust to help satisfy the gift tax obligation. The 1970 Family Trusts were expressly directed, in the event that Jennie should survive Oliver, not to pay any gift taxes which might have accrued, so these trusts were also not an available source of funds for Oliver's executors.

Nor could the Oliver S. and Jennie R. Donaldson Charitable Trust be used. The trustees thereof had no express authority to pay Oliver's debts and, like the trustees of the 1968 Family Trust, they were restrained by their fiduciary responsibilities from contributing to his gift tax obligation.

■ While Oliver's probate assets could be utilized for payment of the gift taxes, these assets totaled less than $200,000. The only other property from which the gift

taxes could be paid was that comprising Oliver's trust, which upon his death was to be divided into the Share A marital trust and the Share B charitable trust. While Share B was to be charged for the payment of all debts and administration expenses of Oliver's estate, it was specifically prohibited from making payment towards the gift taxes should Jennie survive Oliver. Thus, by process of elimination, the only remaining assets which could be considered a source for payment of the gift taxes were those which would fund Share A. Moreover, Oliver's estate planners were aware of this fact, for the November 29, 1969 trust agreement provided that, in the event Jennie predeceased Oliver, the assets otherwise designated for Share A were instead to go to Share B and all of Oliver's debts and administration expenses, including any gift taxes, were to be paid from Share B.

Under New York law, the executors had the ability to reach these assets in order to pay the gift taxes.[3] As mandated by statute, all of the property of a decedent is chargeable with the payment of administration and funeral expenses, debts of the de-

cedent, and any taxes for which the estate is liable. N.Y.Est., Powers & Trusts Law (McKinney) § 13–1.3(a)(1) (1967). Where such property is insufficient to satisfy both the estate's obligations and all dispositions under the will, the executors are authorized to deploy the various interests in the decedent's estate for purposes of paying such estate obligations, including "any disposition to a surviving spouse which qualifies for the estate tax marital deduction." N.Y. Est., Powers & Trusts Law (McKinney) § 13–1.3(c)(5) (1967). This being the case, Oliver's executors clearly had discretionary authority to make use of the Share A assets to satisfy the gift taxes due.[4]

▇▇▇ Unlike plaintiffs, we do not find such a conclusion to conflict with Oliver's stated intentions. Of the available property in his estate, he had unambiguously expressed a desire that Share B not be used to pay gift taxes. Nothing at all was said in this regard about Share A. Consistent with the state statute,[5] Oliver's executors would have been entirely justified in charging the gift tax to Share A, and not allocating the debt between the two dispositions.[6]

---

**3.** Generally speaking, state law is determinative of property rights, while the manner and extent to which such rights are taxed are determined by federal law. *Morgan v. Commissioner*, 309 U.S. 78, 80–81, 60 S.Ct. 424, 425, 84 L.Ed. 585 (1940). The property from which a decedent's debts and taxes are payable and the order of payment of these items are governed by the applicable state law. *Riggs v. del Drago*, 317 U.S. 95, 97–98, 63 S.Ct. 109, 110, 87 L.Ed. 106 (1942); *Greene v. United States*, 476 F.2d 116, 117–18 (7th Cir. 1973).

**4.** *See also In re Estate of Dunham*, 36 A.D.2d 467, 320 N.Y.S.2d 951 (1971); *In re Morawetz' Will*, 32 Misc.2d 762, 231 N.Y.S.2d 1000 (1962).

Moreover, Article Seventh of Oliver's will, executed on July 17, 1968, gave to his executors the discretionary power, *inter alia*, to pay his debts. This provision was expressly ratified in a codicil to his will executed on November 29, 1969, the same day that the trust agreement established Oliver's trust. The effect of the codicil was to republish the will and make it speak from the new date. *In re Baker's Estate*, 174 Misc. 93, 19 N.Y.S.2d 875 (1940). Consequently, this will provision revoked or amended any inconsistent testamentary features of Oliver's trust. *See In re Sahakian's Estate*, 44 Misc.2d 849, 255 N.Y.S.2d 520 (1965); *Broga v. Rome Trust Co.*, 151 Misc.

641, 272 N.Y.S. 101 (1934). Therefore, Article Ninth of the November 29, 1969 trust agreement concerning the payment of debts and expenses of the estate and allegedly restricting the executors' ability to pay the gift taxes, was superseded in that respect by the general grant of authority contained in Oliver's will.

**5.** N.Y. Est, Powers & Trusts Law (McKinney) § 13–1.3(d) provides:

"Whenever the provisions of this section are inconsistent with the express or implied intention of the testator * * * to prefer certain beneficiaries under his will to others, the property of the estate shall be applied and the interests of beneficiaries under the will shall abate in such manner as is necessary to give effect to the intention of the testator."

**6.** Nor does this interpretation disregard Oliver's intention that Share A secure for his estate a marital deduction. A testator's intention, even where clearly ascertainable, must yield to a controlling statute. *In re McGuire's Will*, 123 N.Y.S.2d 428 (1953), aff'd, 283 A.D. 825, 129 N.Y.S.2d 250 (1954). Oliver's wishes concerning a marital deduction were followed. His estate has obtained the desired marital deduction for the Share A property, albeit subject to reduction in value for the gift tax liability.

Thus, we find that as a direct result of Oliver's death, the assets designated for Share A were "encumbered" for purposes of section 2056(b)(4)(B). These assets were the only available source for the payment of Oliver's gift taxes, a burden squarely resting on the executors of his estate. Furthermore, the executors were empowered to use these assets for that purpose under their general authority to pay the debts of the estate. This authority to make payment, whether or not actually exercised, was all that is required to defeat a marital deduction to the extent of the property interest subject to diversion. *Estate of Wycoff v. Commissioner*, 506 F.2d at 1148–50.[7]

It is irrelevant that the actual payment of the gift taxes was cast in the form of having been made by Jennie.[8] The record establishes that it was wholly the decision of the executors that led to the payments that were made. Under Article SECOND of the November 29, 1969 trust agreement, the trustees of the marital trust had sole discretion over whether or not to disburse any portion of the trust principal to Jennie. She had no power to demand that they do so. Even though her letters requesting release of the trust assets were couched as directions to the trustees, they were not obligated to carry out these directions. It is reasonable to assume that the trust assets were released to Jennie only because she had indicated an intention to use those assets to pay the gift taxes, thereby fulfilling the executors' own responsibilities.

Plaintiffs maintain that since Oliver had failed to pay his gift taxes when due, upon his death liability for payment shifted to the donees of the gifts as transferees. Plaintiffs believe that because the transferees represented an available source of payment, somehow Oliver's estate was absolved of any responsibility for the delinquent gift taxes. However, plaintiffs' argument fails to recognize that even though the transferee liability provision causes a donee to be immediately and directly liable for the gift tax should the donor fail to pay the tax when due, section 6901(a)(1)(A)(iii), this does not prevent the IRS from seeking payment from the donor. As previously stated, section 2502(d) requires that the gift tax be paid by the donor. This fixes primary liability for the tax on the donor, *see* R. STEPHENS, G. MAXFIELD & S. LIND, FEDERAL ESTATE & GIFT TAXATION § 9.03[3] at 9–11 (4th ed. 1978), or, if he dies, upon his estate. Treas.Reg. § 25.2502–2 (1958).[9] The liability of the donee arises only should the donor fail to pay the tax, section 6324(b), and is, in that sense, secondary or qualified. *Mississippi Valley Trust Co. v. Commissioner*, 147 F.2d 186, 187–88 (8th Cir. 1945). There is nothing in the Code requiring the IRS to obtain recovery from the donees in lieu of attempting to secure payment directly from the assets of the donor's estate. For this reason, we find that the IRS acted completely within its prerogative in assessing and collecting the unpaid gift taxes from Oliver's estate.[10]

We find as a matter of law therefore that the marital deduction must be reduced in this case. To hold otherwise would enable the estate to receive a double deduction, once for the claim against the estate under

---

7. It is for this reason that plaintiffs' alternative argument that the marital deduction should only be reduced by the amount actually paid towards the gift taxes must also fail. It is the ability to divert, and not the actual diversion, which determines the amount of the reduction. *See Estate of Wycoff v. Commissioner,* 506 F.2d at 1148–50.

8. Additionally, in determining whether an interest of the surviving spouse is entitled to a marital deduction, the tax consequences are to be determined as of the time of the death of the decedent. *Jackson v. United States*, 376 U.S. 503, 508, 84 S.Ct. 869, 872, 11 L.Ed.2d 871

(1964); *Estate of Wycoff v. Commissioner*, 506 F.2d at 1149.

9. Section 6321 imposes a lien on the property of the donor when a tax is not paid when due.

10. Nor does the fact that Jennie elected to split the gifts made by Oliver pursuant to section 2513 relieve his estate from responsibility for payment of the gift taxes. The estate itself remained jointly and severally liable for the tax, regardless of who ultimately made payment. Treas.Reg. § 25.2513–4 (1958).

section 2053 and then again under section 2056, the marital deduction provision, for the same amount. This we cannot permit, particularly where the amount in question would therefore escape taxation in both the estate of the decedent and the surviving spouse.

## III

Having decided that the partial disallowance of the claimed marital deduction was proper, we turn to the gift tax question.[11] Essentially, it is plaintiffs' position that no gift tax was due or owing with respect to the 1970 Family Trusts and that the decedent's estates are entitled to a refund of the taxes paid in connection with those trusts because the trust assets were, at all times, subject to use for the payment of Oliver's estate and death taxes, which eventually totaled almost $8,000,000, or nearly twice the value of the trusts.

■■■■ Under the terms of the November 29, 1969 trust agreement, the 1970 Family Trusts were revocable "during the lifetime of the Donor, and prior to January 2, 1970." Thus, because of Oliver's express reservation of control over the ultimate disposition of the trust assets, no gifts were made at the time of the transfers in trust. However, once January 1, 1970, had passed without revocation, the power to revoke having thereby lapsed, the trusts became completed gifts for federal gift tax purposes. Treas.Reg. § 25.2511–2(c) and (f) (1958). As such, they were, at that time, subject to valuation. Section 2512(a) provides that "[i]f [a] gift is made in property,

the value thereof *at the date of the gift* shall be considered the amount of the gift." (Emphasis added.) And, in accordance with this provision, Jennie and plaintiffs placed the value of the 1970 Family Trusts at $4,743,376, as reflected by the gift tax returns which they caused to be filed on March 25, 1971.[12] Notwithstanding this fact, plaintiffs now repudiate their actions, contending that the obligation to pay estate and death taxes rendered the gifts without value when made.

We do not agree. While it is true that the 1970 Family Trusts were obligated to pay Oliver's estate tax liability,[13] which could reduce the value of the gifts, *see Harrison v. Commissioner*, 17 T.C. 1350, 1354–55 (1952), we find that the assumed obligation was not itself susceptible to valuation at the date of the gifts because the economic burden of paying these taxes was then unknown.[14] Plaintiffs have presented no evidence to indicate that it was possible to approximate the value of this obligation at that time. Indeed, they cannot, for at the date of the gifts, the amount of estate and death taxes payable from the 1970 Family Trusts was highly conjectural. If Oliver lived until May 1971, the value of the 1968 Family Trust would no longer have been included in his estate as a gift in contemplation of death under section 2035, significantly reducing his estate tax liability. Moreover, had he lived for several more years, the size of his estate would have continued to diminish, leaving the 1970 Family Trusts with an ever-decreasing es-

11. Since plaintiffs' theory for recovery is predicated on the existence of an estate tax liability, we reach this issue only because we have concluded that the estate tax assessment was correct.

12. On audit, the IRS recomputed the value of these trusts to be $4,100,159 at the date of the gifts.

13. A reading of the November 29, 1969 trust agreement indicates to us that it was not Oliver's intent to limit the value of the gifts passing in trust to only that amount exceeding the value of the assets necessary to pay his estate tax liability. Articles SIXTH, SEVENTH and EIGHTH manifest an unqualified intent to establish the

several trusts, subject only to Oliver's power to revoke. It is not until Article NINTH, wherein Oliver sets forth directions for the administration of his estate, that first appears the obligation that could potentially divert the assets of the 1970 Family Trusts from the donees. As drafted, the trust agreement does not evidence any clear intention that the entire value of the trust assets were not to be considered as property passing from the donor.

14. For this reason, the present situation is distinguishable from *Harrison v. Commissioner*, 17 T.C. 1350 (1952), and *Gruen v. Commissioner*, 1 T.C. 130 (1942).

tate tax obligation. Thus, plaintiffs' inability to reasonably estimate the amount of tax, if any, to be paid from the 1970 Family Trusts made it proper to compute the gift tax on the basis of the full value of the trust assets. *Robinette v. Helvering*, 318 U.S. 184, 188–89, 63 S.Ct. 540, 542, 87 L.Ed. 700 (1943).

This conclusion is not altered by the fact that Oliver happened to die on January 2, 1970, thereby fixing his estate tax liability. We know of no authority which permits us to consider subsequent events or developments in determining value for gift tax purposes. The pertinent regulations require only that "[a]ll relevant facts and elements of value *as of the time of the gift* shall be considered." Treas.Reg. § 25.-2512–1 (1958). (Emphasis added.) At the time that the gifts herein were completed, Oliver was still alive with a life expectancy of 2.7 years. We are unable to say that his sudden death on January 2, 1970, is sufficient justification to cause us to reconsider the determinations properly made as an initial matter.[15]

### IV

 Defendant, in response to plaintiffs' refund actions, has raised three claims with respect to Oliver's estate tax liability. These claims concern the allowability of an estate tax charitable deduction for the value of Share B, the amount of the estate tax charitable deduction taken for the Oliver S. and Jennie R. Donaldson Charitable Trust and the amount of the deduction taken for executor's commissions under section 2053.

Because the time for assessing a deficiency against Oliver's estate had run by the time the petitions herein were filed, these claims can only be used as an offset to plaintiffs' claims, and not as the basis for a money judgment against the estate. *See Lewis v. Reynolds*, 284 U.S. 281, 283, 52 S.Ct. 145, 146, 76 L.Ed. 293 (1932); 4 B. BITTKER, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS § 115.7 at 115–40—115–41 (1981). Therefore, since we have decided against plaintiffs on each of their principal claims, we need not address defendant's claims which are mooted by our holding.

### CONCLUSION

In the light of the preceding analysis, we hold that plaintiffs are not entitled to recover on any of their claims for refund. Accordingly, plaintiffs' motion for summary judgment is denied and defendant's motion for summary judgment is granted. The petitions are dismissed.

---

**15.** On brief, defendant also raised arguments of estoppel and equitable recoupment. Defendant contended that plaintiffs were precluded from denying that taxable gifts had been made in 1970 because they had waited until after acceptance of Oliver's estate tax return by the IRS, wherein the 1970 gifts had been included in the estate as gifts made in contemplation of death under section 2035 and a corresponding gift tax credit had been allowed, to file their claims for refund, thereby preventing, as a practical matter, the IRS from seeking to recover the gift tax credit before the statute of limitations for assessment of further estate taxes had run. In view of our resolution of the gift tax question, we need not consider the merits of these arguments.