ESTATE OF JENNIE R. DONALDSON, DECEASED, WILLIAM E. MURRAY, LEILA M. ATWOOD and PERRY M. SAMPLE, Executors, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Donaldson v. Commissioner
Docket No. 2227-77.
United States Tax Court
T.C. Memo 1985-33; 1985 Tax Ct. Memo LEXIS 598; 49 T.C.M. (CCH) 564; T.C.M. (RIA) 85033; January 16, 1985. William E. Murray, for the petitioner. Bradford A. Johnson, for the respondent. SWIFT MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent, in a statutory notice *601 dated December 27, 1976, determined a deficiency of $13,796.689.72 in petitioner's Federal estate tax liability. Following concessions by the parties, the sole issue remaining for decision is the net value of property received by decedent Jennie R. Donaldson (hereinafter referred to as "Jennie") from the estate of her deceased husband Oliver S. Donaldson (hereinafter referred to as "Oliver") for purposes of computing the amount of credit for tax on prior transfers to which Jennie's estate is entitled, pursuant to Section 2013. [1]
This case was submitted fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulated facts are incorporated herein by this reference. The parties also have stipulated that any appeal from the decision in this case would lie to the United States Court of Appeals for the Second Circuit. The relevant facts involved herein are complex and in essentially all respects are identical to those previously set forth by the United States Court of Claims in its opinion in Murray v. United States,231 Ct.Cl. 481, 687 F.2d 386 (1982). *602 That case concerned the Federal estate and gift tax liabilities of Oliver's estate and the Federal gift tax liabilities of Jennie's estate. As previously explained, this case concerns the Fedeal estate tax liability of Jennie's estate, but the questions that must be decided herein arise from the very same estate planning transactions that were involved in Murray.Also, as will be explained later, the legal issue to be decided herein is essentially identical to the legal question that was decided in Murray. In the interest of judicial economy, we utilize substantially verbatim the statement of facts set forth by the Court of Claims in that opinion, followed by our statement of the additional facts that are relevant to the specific issues involved in this case but that were not included in the findings of fact in the Murray opinion. FINDINGS OF FACT We now quote from Murray v. United States,supra at 388-390, and find as follows: The subject disputes stem from a complicated series of estate planning transactions taken by Oliver S. Donaldson (Oliver). Oliver owned 76,875 shares of stock in International Business Machines Corporation *603 (IBM) which he had acquired during the 1920's. His wife, Jennie R. Donaldson (Jennie), also owned a considerable numer of IBM shares in her own name. The Donaldsons were married for 48 years, had no children and lived frugally. Oliver had no next of kin or heirs at law. Jennie had several nephews and nieces and their descendants. Both Oliver and Jennie were residents of New York State. In February of 1968, the Donaldsons, who were then in their nineties, met William E. Murray, a New York attorney, who subsequently drafted for Oliver a revocable intervivos trust agreement dated February 8, 1968, to which was conveyed all shares of Oliver's IBM stock, which had, as the result of a 100-percent stock dividend earlier that year, doubled in number and were valued at approximately $37,500,000. At the same time, Jennie's IBM shares were transferred to a separate personal revocable trust for her benefit, No. T-984B. On May 11, 1968, Oliver's trust agreement was amended to create an irrevocable trust for two of Jennie's female relatives and their issue (No. T-984C, the 1968 Family Trust). The 1968 Family Trust held 51,250 shares of IBM stock and constituted a completed gift *604 for federal gift tax purposes. However, no gift tax was paid by Oliver at that time. Oliver's original trust continued in existence and held the remaining 102,500 shares of IBM stock. A new trust agreement was drawn up on November 29, 1969, which revoked all of the provisions of the February 8, 1968 trust agreement except for the 1968 Family Trust and Jennie's personal trust (No. T-984B). This new trust agreement divided the 102,500 shares of IBM stock into five separate trust accounts as follows: (1) No. T-1030, a revocable trust funded with 80,000 of the IBM shares providing an income interest for life to Oliver, with the trustees having unlimited discretion to invade the principal for Oliver's benefit (Oliver's trust); (2) No. T-1031, an irrevocable charitable trust containing 9,500 IBM shares (the Oliver S. and Jennie R. Donaldson Charitable Trust); (3) No. T-1032, a revocable trust for the benefit of one of Jennie's male relatives, funded with 3,500 IBM shares; (4) No. T-1033, a revocable trust for the benefit of another of Jennie's male relatives, funded with 3,000 IBM shares; and (5) No. T-984C, a revocable "addition" of 6,500 IBM shares to the 1968 Family Trust *605 (Collectively, Nos. T-1032, T-1033 and the T-984C addition are the 1970 Family Trusts). The 1970 Family Trusts were revocable "during the lifetime of the Donor, and prior to January 2, 1970." They were also subject to pro rata assessment for the payment of "all estate, inheritance, succession, transfer or other death taxes imposed by any jurisdiction whatsoever upon any property wheresoever situated forming part of the gross taxable estate of the Donor, whether passing under his Will or otherwise, including interest and penalties thereon * * *." According to the terms of Article SECOND of the November 29, 1969 trust agreement, upon Oliver's death, if Jennie survived him, the assets of Oliver's trust were to be divided into two equal shares. "Share A" was to provide an income interest for life to Jennie, with the trustees having unlimited discretion to invade the principal for her benefit, and reserving to her a testamentary power of appointment. It was Oliver's stated intention that Share A "secure for his estate the marital deductdion authorized by the Internal Revenue Code of 1954." * * * "Share B," subject to the payment of certain debts and expenses of Oliver's estate, was *606 distributable for the benefit of the Oliver S. and Jennie R. Donaldson Charitable Trust. Article SECOND further provided that if Jennie did not survive Oliver, then all of the assets of Oliver's trust were to go to Share B. Under these circumstances, Article NINTH of the November 29, 1969 trust agreement required that all of Oliver's debts, the expenses of his estate and any gift taxes (including any interest and penalties) be paid from Share B. No estate or other death taxes were to be paid therefrom, as these taxes were to be paid from the assets of the 1970 Family Trusts. If [those] assets were insufficient to pay all of Oliver's death taxes, Article FIFTH of the 1968 Family Trust authorized payment of any death taxes apportionable thereto from the trust assets. However, [that] trust contained no provisions concerning the payment of Oliver's gift taxes or of the debts and expenses of his estate. If Jennie survived Oliver, Article NINTH explicitly stated that upon Oliver's death, no gift taxes were to be paid from Share B. The trust agreement, in that event, contained no express provision for the payment of gift taxes. Oliver died on January 2, 1970, at the *607 age of 97, without ever having exercised his power of revocation over any of the revocable trusts. Consequently, the 1970 Family Trusts became completed gifts for federal gift tax purposes at that time, with an aggregate fair market value of $4,100,159. Moreover, pursuant to Article SECOND of the November 29, 1969 trust agreement, Oliver's trust was divided into two separate trusts, each containing 40,000 shares of IBM stock. Each trust was valued at $12,793,777 on audit by the Internal Revenue Service (IRS). At the time of his death, Oliver had accrued a gift tax liability of over $12,000,000. This amount included approximately $523,000 in gift taxes and interest owed from gifts made prior to 1968, $8,785,668 in gift taxes and interest due from the creation of the 1968 Family Trust, and $2,721,262 arising on January 1, 1970, when the 1970 Family Trusts became irrevocable. Jennie decided to treat one-half of these gifts as her own pursuant to section 2513(a)(1) of the Internal Revenue Code of 1954, thereby becoming jointly and severally liable for the entire gift tax. 26 U.S.C. 2513(d)(1970). In the following months, she undertook *608 to satisfy this liability by requesting, at various times, that the trustees of Share A distribute to her a sufficient sum to enable her to make payment of the taxes and interest due. In particular, on March 10, 1971, Jennie notified the trustees of Share A that she had executed and was prepared to file gift tax returns on behalf of herself and on behalf of Oliver's estate for the gifts made during 1970 and requested that adequate funds be released to pay the gift taxes due and owing thereon. In response, the trustees made a distribution to Jennie of $1,386,493 from Share A (an amount equaling $1,360,631 in gift taxes for the gifts made by Oliver in 1970 and $25,862 for gifts made by Jennie in 1970) and also a distribution of $1,360,631 from her separate revocable trust. On March 25, 1971, Jennie and [the executors of Oliver's estate] filed separate gift tax returns for the 1970 gifts, each reporting $1,360,631 in gift taxes as due and payable.These gift tax returns, together with payment of $2,721,262, were received by the IRS on March 30, 1971. In total, over a period of 18 months, the trustees of Share A distributed to Jennie $10,712,369.80, of which $10,648,265.80 *609 represented gift taxes and interest for gifts made by Oliver between 1963 and 1970, and $64,104 represented gift taxes and interest incurred by Jennie for gifts made by her personally. Oliver's estate tax return was filed with the IRS on April 2, 1971, reflecting a taxable estate of less than zero. Accordingly, the estate reported that no federal estate tax was due or payable. After a period of negotiation and proposed adjustments, by letter of February 14, 1974, the IRS determined that Oliver had died with a taxable estate of $20,308,683 and thus owed a net federal estate tax of $4,499,168.26. In part, this assessment resulted from the reduction of the marital deduction claimed by the estate by $12,009,646, an amount equaling the gift taxes and interest owed by Oliver at his death. The assessed tax, along with interest of $760,112.90, was subsequently paid * * * on behalf of Oliver's estate. Jennie died on July 31, 1973. On March 13, 1974, [the] executors of her estate, filed a claim for the refund of the gift taxes paid with respect to the 1970 Family Trusts. At the same time, [Oliver's executors] filed a similar refund claim on behalf of Oliver's estate. The legal *610 basis of both claims was that the gifts had no value when made since the assets comprising the 1970 Family Trusts were encumbered for the payment of Oliver's estate tax liability. [Oliver's executors] also filed a claim for refund on April 1, 1974, with respect to the federal estate taxes paid by Oliver's estate, arguing that the estate was entitled to the marital deduction originally taken. Each of these claims was disallowed on March 21, 1979, leading to the actions filed in [the Court of Claims]. [Footnote omitted.] The three refund suits described above were consolidated by an order of the Court of Claims. The executors of the estates filed a motion for summary judgment, and the United States filed a cross-motion for summary judgment. The Court of Claims granted the United States' motion for summary judgment, and denied the executors' motion for summary judgment. The Court thereby held that the various estates were not entitled to recover any portion of the amounts claimed. In reaching its decision with regard to Oliver's Federal estate tax liability, the Court of Claims, due to the many restrictions placed upon the various assets comprising Oliver's *611 estate, held that "by process of elimination, the only remaining assets [of Oliver's estate] which could be considered a source for payment of the gift taxes were those which would fund Share A." 687 F.2d at 392. The Court of Claims therefore concluded that the marital deduction claimed by Oliver's estate under section 2056 must be reduced by the entire $12,009,646 in gift taxes owed because the gift taxes constituted an encumbrance on the assets of Share A. In reaching its decision with regard to Oliver's and Jennie's Federal gift tax liabilities, the Court of Claims held that the amount of the gifts was fixed and to be determined as of the date that the gifts became irrevocable. Therefore, the value of the gifts could not be reduced for gift tax purposes by estate taxes that later were determined to be payable out of the gifted property. Oliver's will, executed on July 17, 1968, made certain specific bequests, including all of his personal property to Jennie, and his residence to Jennie for life, with the remainder to charity. The Seventh Article of his will gave his co-executors discretionary power in the payment of his debts. A codicil to the will *612 was executed on September 27, 1969, the primary provision of which was to leave the residue of his estate to the trust which was created the same day (T-1030). Other provisions of the will, (including the granting of discretionary power in the paying of his debts to his executors) were ratified by the codicil. Jennie's will, executed on July 30, 1970, made certain specific bequests and exercised her general power of appointment over Share A of the November 29, 1969, trust. The will directed that William E. Murray, Leila M. Atwood and Perry M. Sample (all of whom had also served as executors of Oliver's estate) be appointed co-executors of her estate. The Dutchess County Surrogates' Court of Poughkeepsie, New York, approved the above three individuals as co-executors, and a Federal estate tax return was timely filed on behalf of the estate on May 1, 1974. OPINION Section 2013 provides a credit against the Federal estate tax liability of an estate where property which is included in the gross estate was received by the decedent from a transferor who died within ten years before or two *613 years after the decedent died and where that property also was included in the gross estate of the transferor. The purpose of that credit is to alleviate a hardship that could otherwise result from the death in quick succession of two or more persons. Stephens, Maxfield & Lind, Federal Estate and Gift Taxation, p. 3-22 (5th Edition, 1983). The amount of the credit for the tax on prior transfers (hereinafter referred to as "TPT") varies as a percentage of the maximum amount allowable, based upon the time between the dates of death of the decedent and of the transferor. The parties herein agree that petitioner is entitled to 80 percent of the maximum credit available, due to the fact that Oliver died between three and four years prior to Jennie. Section 2013(a)(1). [2]
*614 The computation of the maximum amount of the credit allowable depends, among other factors, upon the net value of the property transferred to the decedent. The net value is determined by the amount which was used with respect to the property transferred for purposes of determining the final Federal estate tax liability of the transferor, less certain adjustments or reductions. Section 2013(d). The controversy herein concerns the reductions required by section 2013(d)(2)[3] to the value of the property for encumbrances against the property at the time it was transferred, or for obligations imposed by the transferor on the decedent with respect to the property transferred. *615 Respondent contends that the value of the property which passed from Oliver to Jennie should be reduced by the entire $12,009,646 in gift taxes owed by Oliver at the time of his death because, respondent asserts, the entire gift tax liability constituted an encumbrance on that property pursuant to section 2013(d)(2).Petitioner contends that the reduction in the value of that property for encumbrances should not be $12,009,646, but rather that the encumbrances only amounted to $8,577,572. The difference of $3,432,074 between respondent's and petitioner's figures for the encumbrances which reduce the value of the property passing from Oliver's estate to the decedent herein is attributable to three separate items: (1) $593,086 in gift taxes and interest owed by Oliver's estate which petitioner asserts were payable out of Share B, (2) gift tax payments with respect to the 1970 family trusts totalling $2,721,262, or, in the alternative, the half of that amount that was not actually paid out of Share A, and (3) $117,726 in "available probate assets." For the reasons set forth below, we agree with respondent. As explained, Murray v. United States,231 Ct.Cl. 481, 687 F.2d 386 (1982), *616 involved the Federal estate and gift tax liability of Oliver's estate and the Federal gift tax liabilities of Jennie's estate.The Court of Claims therein addressed the statutory language found in section 2056(b)(4)(B), which pertains to the effect of encumbrances on property passing to the surviving spouse for purposes of computing the correct marital deduction allowed under the Federal estate tax. [4] In the instant case, the relevant statutory language, which pertains to the effect of encumbrances on the value of property eligible for the TPT credit, is found in section 2013(d)(2). The language of the two statutes (namely, sections 2056(b)(4)(B) and 2013(d)(2)) is virtually identical. The use in those two statutes of virtually identical language is not coincidental. It was the intent of Congress that "the value of property transferred to the decedent [under section 2013] shall be determined in the same manner as the value of property interests passing to a surviving spouse under section 2056 is determined." S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong. *617 , 2d Sess. 467 (1954). The clear Congressional intent (namely, that the value of property should be determined for purposes of the TPT credit under Section 2013 in the same manner that the value of property is determined for purposes of the marital deduction under section 2056) has previously been recognized by this Court. In Estate of Gilruth v. Commissioner,50 T.C. 850, 855 (1968), *618 the issue was whether certain attorney's and executor's fees should be deducted from the value of property for purposes of computing the TPT credit even though the fees had not been deducted on the Federal estate tax return. In holding that the fees should be deducted from the value of the property in order to arrive at the net value of property previously taxed, we looked to the identical language of the marital deduction provision in section 2056 and concluded that since the fees would have been deducted from the value of the property in computing the marital deduction, they must also be deducted from the value of the property in computing the TPT credit. With respect to the close relationship between the relevant statutory language of section 2013 and section 2056, we stated in Gilruth as follows: Finally, our decision is consistent with the interpretation of similar provisions relating to the marital deduction. As passed by the House, section 2013(d) was in substance very similar to such provision as enacted, but was differently worded. However, the Senate substituted a provision which uses the same language as section 2056(b)(4), relating to valuation of property *619 passing to the surviving spouse for purposes of the marital deduction. This provision in turn was taken from section 812(e)(1)(E) of the 1939 Code. The Senate change was explained as follows: In order to provide more certain rules under which property is valued for the purposes of computing the credit and the limitation of the credit under this section, your committee struck the provisions in the House bill on this matter and inserted new rules based on the principles established under the estate tax marital deduction. * * * [S. Rept. No. 1622, p. 122, emphasis added by Estate of Gilruth v. Commissioner,50 T.C. at 854-855.] We now turn to a consideration of the three specific items that petitioner argues do not constitute encumbrances against the property that Jennie received from Oliver's estate. First, petitioner asserts that Share B of the November 29, 1969, trust agreement was liable for the payment of Oliver's 1963 and 1965 gift taxes, and that therefore that amount (namely, $593,686) should not be considered an encumbrance on Share A. However, the Ninth Article of the trust provided with respect to Share B as follows: NINTH: Upon the *620 death of the Donor, the Trustees shall pay over to the legal representatives of the estate of the Donor out of the principal of Share B as described in Article SECOND hereof such sum or sums as the said legal representatives shall request in writing from time to time for the payment or discharge of all debts, costs, charges and expenses of administration of the Donor and of the estate of the Donor other than all taxes and Federal gift taxes (except as to Federal gift taxes and interest or penalties thereon, which shall be payable out of the principal of Share B if the wife of the Donor shall predecease him), imposed by any jurisdiction whatsoever upon any property wheresoever situated forming part of the gross taxable estate of the Donor, whether passing under his Will or otherwise, including interest or penalties thereon, if any. (Emphasis added.) As the Court of Claims in Murray v. United States,supra at 392, stated, the above-quoted trust provision made it expressly clear that, "While Share B was to be charged for the payment of all debts and administration expenses, it was specifically prohibited from making payment towards the gift taxes should *621 Jennie survive Oliver." Jennie did survive Oliver, and we therefore conclude that the $593,686 in gift taxes due by Oliver's estate for 1963 and 1965 were properly payable out of Share A, and constituted an encumbrance thereon under section 2013(d)(2). "[B]y process of elimination, the only remaining assets which could be considered a source for payment of the gift taxes were those which would fund Share A," Murray, at 392. The second item that petitioner argues does not constitute an encumbrance against the property that Jennie received from Oliver's estate is the $2,721,262 in gift taxes paid with respect to the 1970 family trusts. Petitioner argues that the value of the gifts represented by the 1970 Family Trusts was too conjectural, at the time the gifts were made in 1970, to constitute an encumbrance on the property as of the date of Oliver's death on January 2, 1970. That argument is based on the point that the 1970 Family Trusts were encumbered with the Federal estate tax liability of Oliver and that since those estate taxes were not finally determined until many years after Oliver's death (namely, 1982--when the Court of Claims decision in Murray became *622 final), the amount or value of the 1970 gifts and of the Federal gift tax liability with respect thereto was just guess work as of January 2, 1970. In the alternative, petitioner argues that only the gift taxes actually paid out of Share A (namely, one-half of $2,721,262 or $1,360,631) should be treated as an encumbrance against the property under section 2013(d)(2). Petitioner's argument regarding the $2,721,262 in gift taxes paid with respect to the 1970 Family Trust was raised in the Court of Claims proceeding in Murray and was rejected therein. It was not the gift tax liability that was conjectural in amount at the time the gifts were made, but rather the amount of the Federal estate tax liability imposed on Oliver's estate that would become an obligation of the 1970 Family Trusts. As the Court of Claims concluded-- While it is true that the 1970 Family Trusts were obligated to pay Oliver's estate tax liability, which could reduce the value of the gifts, see Harrison v. Commissioner,17 T.C. 1350, 1354-55 (1952), we find that the assumed obligation was not itself susceptible to valuation at the date of the gifts because the economic burden *623 of paying these taxes was then unknown. Plaintiffs have presented no evidence to indicate that it was possible to approximate the value of this obligation at that time.Indeed, they cannot, for at the date of the gifts, the amount of estate and death taxes payable from the 1970 Family Trusts was highly conjectural. If Oliver lived until May 1971, the value of the 1968 Family Trust would no longer have been included in his estate as a gift in contemplation of death under section 2035, significantly reducing his estate tax liability. Moreover, had he lived for several more years, the size of his estate would have continued to diminish, leaving the 1970 Family Trusts with an ever-decreasing estate tax obligation. Thus, plaintiffs' inability to reasonably estimate the amount of tax, if any, to be paid from the 1970 Family Trusts made it proper to compute the gift tax on the basis of the full value of the trust assets. Robinette v. Helvering,318 U.S. 184, 188-89, 63 S.Ct. 540, 542, 87 L.Ed. 700 (1943). This conclusion is not altered by the fact that Oliver happened to die on January 2, 1970, thereby fixing his estate tax liability. We know of no authority which permits *624 us to consider subsequent events or developments in determining value for gift tax purposes. The pertinent regulations require only that "[a]ll relevant facts and elements of value as of the time of the gift shall be considered." Treas. Reg. § 25.2512-1 (1958). (Emphasis added.) At the time that the gifts herein were completed, Oliver was still alive with a life expectancy of 2.7 years. We are unable to say that his sudden death on January 2, 1970, is sufficient justification to cause us to reconsider the determinations properly made as an initial matter. [Footnotes omitted.] Murray v. United States,687 F.2d 386 at 394-395. Petitioner alternatively argues that only one-half of the gift tax liability arising from the 1970 Family Trusts should be treated as an encumbrance on the value of Share A for purposes of computing the TPT credit under Section 2013(d)(2). Petitioner argues that the other one-half of the gift tax liability arising from the 1970 Family Trusts should not be treated as an encumbrance on the value of *625 Share A because Jennie, not Share A, actually paid the other one-half of the gift taxes due out of her own separate trust account and because Jennie joined with the executors of Oliver's estate to elect gift-splitting under section 2513. Liability for the entire gift tax is joint and several where gift-splitting is elected. Section 2513(d). [5] Therefore, the fact that gift-splitting was later elected does not alter the fact that Oliver's estate remained liable for the entire amount of the gift tax. The liabilities of the estate at the time of Oliver's death determine the liabilities which encumbered the assets passing from Oliver to Jennie. The case of Proesel v. United States,585 F.2d 295 (7th Cir. 1978), *626 involved the converse of the instant situation. In that case, the non-donor spouse predeceased the donor, and the donor-spouse joined with the executor of the estate in order to elect gift splitting under section 2513. The Seventh Circuit upheld the denial of a deduction to the estate (under section 2053) of one-half of the gift taxes which were actually paid by the estate on the basis that the gift taxes were not liabilities of the decedent on the date of her death. The Seventh Circuit held that "no such liability was 'imposed' on the Estate until such time - decidedly after decedent's death - that consent to treat the matter under section 2513 was filed by the executor." 585 F.2d at 297. Just as the estate of the non-donor spouse in Proesel could not be saddled with an additional obligation for estate tax purposes because of a gift splitting election filed subsequent to the decedent's death, Oliver's estate herein can not be relieved of its obligation (or of half of it) to pay gift taxes due because of the subsequent election by Jennie to split the gift. It is the availability of the assets to satisfy the liability involved that is the critical inquiry *627 and the fact that a portion of the liability was in fact later paid out of different assets does not change the result. Estate of Wycoff v. Commissioner,506 F.2d 1144, 1148-1150 (10th Cir. 1974), affg. 59 T.C. 617 (1973). Finally, the third and last amount that petitioner argues should not be treated as a reduction in the net value of the property for TPT purposes under section 2013(d)(2) is $117,726, since that amount of general probate assets was available in Oliver's estate and should have been used to pay the gift taxes due instead of the assets of Share A. Petitioner cites New York law with respect to the order in which interests in a decedent's estate are to be abated when there is insufficient property to satisfy both estate obligations and dispositions under the will (viz., N.Y. Est. Powers & Trusts § 13-1.3(c)), and petitioner argues that probate assets should abate prior to assets which qualify for the marital deduction, such as Share A. However, as respondent points out, petitioner neglects to cite N.Y. Est. Powers & Trusts Law *628 § 13-1.3(d) (McKinney, 1974) which provides that-- Whenever the provisions of this section are inconsistent with the express or implied intention of the testator to distinguish real property from personal property or to prefer certain beneficiaries under his will to others, the property of the estate shall be applied and the interests of beneficiaries under the will shall abate in such manner as is necessary to give effect to the intention of the testator. As is discussed at length by the Court of Claims in Murray,687 F.2d at 391-392, Oliver's intentions were clear. He expressly prohibited the use of specific assets to pay his gift tax liability and left for that purpose only his probate assets and Share A of Trust T-1030. That was done intentionally, pursuant to an elaborate estate plan. The Seventh Article of Oliver's will gave his co-executors discretionary power in the payment of his debts, which power was ratified in the first codicil to Oliver's will dated November 29, 1969. Therefore, Oliver's co-executors had discretionary authority to determine how the probate assets and Share A were to be applied toward the payment of the gift tax liability, and *629 it is not surprising under the circumstances that they looked to the marital trust, whose assets were sufficient to pay that liability. As previously discussed, it is the availability of the assets to be used for the liability at the time of death which is the crucial inquiry, not whether those specific assets were in fact later used to satisfy the liability. Estate of Wycoff,506 F.2d at 1150. One minor matter remains. Although the parties agree that the value of Jennie's life estate in the family residence is includible in the value of property passing from Oliver to Jennie for purposes of section 2013, there is a discrepancy in the value placed on that life estate interest by the parties. They agree that the fee simple value of the residence was $27,500. The difference arises in the annuity factor to be used in valuing the life interest of Jennie. Respondent has employed an annuity factor of .06040, which he derived from Table I of sec. 20.2031-7(f), Estate Tax Regs., based upon Jennie's age of 96 years at the time of Oliver's death on January 2, 1970. *630 Multiplying $27,500 by respondent's annuity factor of .06040 yields a value for the life estate of $1,661.00. Petitioner asserts that the value of the life estate was $3,294.00, but Petitioner does not provide any explanation therefor.The table used by respondent, which is the one to which reference is made in section 20.2031-7(c), Estate Tax Regs., for use in valuing life estates where the transferor died prior to December 31, 1970, is the correct table, [6] and we adopt respondent's figure of $1,661.00 in valuing Jennie's life estate interest in the residence. Because of concessions, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as amended and in effect for the year in controversy.↩
2. The general rule and the manner of computing the estate tax credit for TPTs is set forth in sec. 2013(a) and (b), as follows: SEC. 2013. CREDIT FOR TAX ON PRIOR TRANSFERS. (a) GENERAL RULE.--The tax imposed by section 2001 shall be credited with all or a part of the amount of the Federal estate tax paid with respect to the transfer of property (including property passing as a result of the exercise or non-exercise of a power of appointment) to the decedent by or from a person (herein designated as a "transferor") who died within 10 years before, or within 2 years after, the decedent's death. If the transferor died within 2 years of the death of the decedent, the credit shall be the amount determined under subsections (b) and (c). If the transferor predeceased the decedent by more than 2 years, the credit shall be the following percentage of the amount so determined-- (1) 80 percent, if within the third or fourth years preceding the decedent's death; (2) 60 percent, if within the fifth or sixth years preceding the decedent's death; (3) 40 percent, if within the seventh or eighth years preceding the decedent's death; and (4) 20 percent, if within the ninth or tenth years preceding the decedent's death. (b) COMPUTATION OF CREDIT.--Subject to the limitation prescribed in subsection (c), the credit provided by this section shall be an amount which bears the same ratio to the estate tax paid (adjusted as indicated hereinafter) with respect to the estate of the transferor as the value of the property transferred bears to the taxable estate of the transferor (determined for purposes of the estate tax) decreased by any death taxes paid with respect to such estate and increased by the exemption provided for by section 2052 or section 2106(a)(3), or the corresponding provisions of prior laws, in determining the taxable estate of the transferor for purposes of the estate tax. For purposes of the preceding sentence, the estate tax paid shall be the Federal estate tax paid increased by any credits allowed against such estate tax under section 2012↩, or corresponding provisions of prior laws, on account of gift tax, and for any credits allowed against such estate tax under this section on account of prior transfers where the transferor acquired property from a person who died within 10 years before the death of the decedent.
3. Section 2013(d) provides as follows: (d) VALUATION OF PROPERTY TRANSFERRED.--The value of property transferred to the decedent shall be the value used for the purpose of determining the Federal estate tax liability of the estate of the transferor but-- * * * (2) where such property is encumbered in any manner, or where the decedent incurs any obligation imposed by the transferor with respect to such property, such encumbrance or obligation shall be taken into account in the same manner as if the amount of a gift to the decedent of such property was being determined; and * * * ↩
4. Section 2056(b)(4) provides: Section 2056. BEQUESTS, ETC., TO SURVIVING SPOUSE. (b) Limitation in the Case of Life Estate or Other Terminable Interest.-- (4) VALUATION OF INTEREST PASSING TO SURVIVING SPOUSE.--In determining for purposes of subsection (a) the value of any interest in property passing to the surviving spouse for which a deduction is allowed by this section-- * * * (B) where such interest or property is encumbered in any manner, or where the surviving spouse incurs any obligation imposed by the decedent with respect to the passing of such interest, such encumbrance or obligation shall be taken into account in the same manner as if the amount of a gift to such spouse of such interest were being determined.↩
5. Section 2513(d) provides: (d) JOINT AND SEVERAL LIABILITY FOR TAX.--If the consent required by subsection (a)(2) is signified with respect to a gift made in any calendar quarter, the liability with respect to the entire tax imposed by this chapter of each spouse for such year shall be joint and several.↩
6. Section 20.2013-4(a), Estate Tax Regs., states that the "value of the interest is determined as of the date of the transferor's death on the basis of recognized valuation principles (see especially §§ 20.2031-7 and 20.2031-10)." Section 20.2031-10, Estate Tax Regs., only applies to transferors dying after December 31, 1970.↩