PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ESTATE OF FRANK ARMSTRONG, JR.,
Frank Armstrong, III, Executor;
FRANK ARMSTRONG, JR., Trust For
Benefit of Frank Armstrong, Jr.,
Frank Armstrong, III, Trustee,
            *Plaintiffs-Appellants,*

v.                                              No. 01-1305

UNITED STATES OF AMERICA,
            *Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Virginia, at Harrisonburg.
James H. Michael, Jr., Senior District Judge.
(CA-98-101-5)

Argued: October 30, 2001

Decided: January 15, 2002

Before WILKINSON, Chief Judge, MOTZ, Circuit Judge,
and Malcom J. HOWARD, United States District Judge for the
Eastern District of North Carolina, sitting by designation.

---

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Chief Judge Wilkinson and Judge Howard joined.

---

## COUNSEL

**ARGUED:** Stephen L. Pettler, Jr., HARRISON & JOHNSTON,
Winchester, Virginia, for Appellants. Joan Iris Oppenheimer, Tax

Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Aubrey J. Owen, OWEN & TRUBAN, P.L.C., Winchester, Virginia, for Appellants. Claire Fallon, Acting Assistant Attorney General, Richard Farber, Ruth E. Plagenhoef, United States Attorney, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

At the age of 91, Frank Armstrong, Jr. gave very substantial gifts of stock to his four children and, primarily through a trust he created, paid millions of dollars in gift taxes on those gifts. Armstrong died less than three years later, triggering estate taxes on those gift taxes. In addition, the IRS assessed additional gift taxes on the grounds that Armstrong undervalued the stock when the original gift taxes were paid. Armstrong's estate and the trust bring this action seeking a refund of both the original and the additional gift taxes. They maintain that the donee children's purported obligation to pay additional gift taxes and potential liability for estate taxes on gift taxes markedly reduced the value of the gifts and thus should reduce the gift taxes attributable to them pursuant to the "net gift" doctrine. We agree with the district court that, given the speculative and illusory nature of the donees' obligation to pay gift and estate taxes, the net gift doctrine does not apply here. Accordingly, we affirm.

I.

The parties stipulated to all relevant facts, and so "[t]he material facts in this matter are undisputed." Brief of Appellants at 9.

A.

In 1991, Frank Armstrong, Jr., then 91 years old, and his four children agreed that Armstrong would carry out his estate plan through *inter vivos* transfers of his stock in National Fruit Products, Inc., a privately held corporation in which Armstrong owned the controlling

interest. The children welcomed this approach because of their concern that Armstrong "might take further actions which would be detrimental to the value of National Fruit shares as a family business" and to them "as heirs of the stock." The events giving rise to this concern included Armstrong's recent transfer of real estate to two young women with whom Armstrong had kept company and his naming of a new executor unfamiliar to the children.

In structuring the gifts of stock, Armstrong, the children, and National Fruit extensively consulted with counsel and repeatedly negotiated with each other. They obtained an appraisal of the value of Armstrong's National Fruit stock and "numerous projections of the tax consequences" of "various scenarios." On the advice of counsel, Armstrong and the children expressly declined to adopt an arrangement requiring the children to pay all gift taxes on the gross gifts they received — that is, a traditional net gift arrangement. The children further declined, also on advice of counsel, to enter into a written agreement to pay the estate taxes on the gift taxes that would be triggered should Armstrong die within three years of making the gifts. Indeed, throughout these consultations and negotiations, the children made clear that they wanted the transfers structured to reduce their gift and estate tax liabilities and to "minimize" their own "direct cash outlay." Armstrong, for his part, would agree to the stock transfers only if, *inter alia*, he received continuing income comparable to his prior dividend payments and was personally exonerated from the expenses and taxes resulting from the stock transfers.

Through the agreed-upon stock transfers, Armstrong was completely divested of all his National Fruit stock, and control of the corporation was shifted to the children. The stock transfers were carried out over two tax years as follows. In December 1991 (the "1991 transaction"), Armstrong conveyed 5,725 shares of his National Fruit common stock to each of his four children and 100 shares to each of his eleven grandchildren. In addition, National Fruit redeemed all of Armstrong's preferred stock for approximately $1,534,150 in cash, plus a private annuity payable to Armstrong. The bulk of the cash from the preferred stock redemption was paid to charitable organizations in donations, although $219,150 was later used to fund the Trust.

In January 1992 (the "1992 transaction"), Armstrong transferred more than 12,000 additional shares of his National Fruit common stock to each of his children. Armstrong also again transferred 100 unredeemed shares to his grandchildren, this time apportioned from the otherwise equal allotments of their respective parents, and transferred approximately 5,000 shares of his common stock to two trusts, a generation-skipping trust and an employee trust, which are not relevant to the current action. National Fruit redeemed Armstrong's remaining common stock, as represented by a promissory note given to Armstrong in the amount of $6,065,300. Then, using the $219,150 from the previous redemption of preferred shares, Armstrong created a grantor trust and assigned the promissory note to that Trust. Under the trust agreement, an irrevocable trust was created naming Armstrong as "the beneficiary." The trust agreement provides for quarterly income payments to Armstrong and that the Trustee "shall pay" the gift and income tax owed by Armstrong in connection with the 1991 and 1992 transactions.

Also as part of the 1991 and 1992 transactions, the children entered into a transferee liability agreement. That agreement provides that the children would pay "the additional gift taxes . . . arising by reason of any proposed adjustment to the amount of the 1991 and 1992 gifts." Thus, this agreement appeared to impose on the children the obligation to pay any *additional* gift taxes in the event the Internal Revenue Service (IRS) subsequently determined that Armstrong had undervalued the gifted stock on his tax returns. However, an attorney who advised Armstrong and his children "regarding the gifts of stock" submitted an affidavit on behalf of the Estate and the Trust in which he stated that the parties agreed that Armstrong would "use a grantor trust to assure payment of taxes . . . in connection with a proper final determination thereof" and the donees would only be "secondarily liable" for these taxes. This same attorney concluded that "[t]he donor . . . and the donees intended" that the arrangement ultimately agreed upon "would protect the donees . . . from having to pay taxes."

In his gift tax returns for 1991 and 1992, Armstrong valued the transferred stock at $100 per share and reported gift tax liability of $1,229,483 in 1991 and $3,027,090 in 1992. The Trust and Armstrong himself paid all of these taxes; the Trust paid the lion's share,

a total of more than $4.2 million for the two years, while Armstrong individually paid just over $40,000. The children paid no gift taxes.

On July 29, 1993, less than three years after the 1991 and 1992 transactions, Armstrong died. He had suffered recurring pulmonary problems prior to the 1991 and 1992 transactions, although the parties stipulated that he did not suffer from any life-threatening conditions at the time of the stock transfers.

Following Armstrong's death, the IRS valued the gifted stock, as of the date of the transfers, at $109 per share. This change in valuation resulted in increased gift tax liability of approximately $118,800 for 1991 and $304,910 for 1992. The children paid none of the additional gift taxes; rather, once again the Trust paid all gift taxes, with interest.

In computing the value of Armstrong's estate, the executor did not include in the estate assets the gift taxes of over $4 million that Armstrong and the Trust had paid on the stock gifts during the three years prior to his death. The IRS determined that the Internal Revenue Code required inclusion of those gift taxes in the estate and assessed an estate tax deficiency of some $2.35 million. Since the stock transfers rendered the estate without assets to pay this deficiency, the IRS assessed each donee child with liability for the estate tax deficiency to the extent of the value of the stock transferred to each.[1]

B.

On April 15, 1996, Frank Armstrong, III, Armstrong's eldest son and the CEO of National Fruit, on behalf of the Estate as its Executor and the Trust as its Trustee, filed claims for refund of all the gift taxes paid in connection with the 1991 and 1992 transactions. The Estate sought a refund of the original gift taxes paid on the stock transferred

---

[1]The Estate and children challenged these determinations in tax court. The tax court upheld the donee children's transferee liability. *See Armstrong v. Comm'r*, 114 T.C. 94, 96 n.4, 102 (2000). This transferee liability attached by law pursuant to 26 U.S.C. § 6324(a)(2), independent of any liability the children assumed pursuant to the transferee liability agreement. *Id.* at 102.

in the amount of some $1,348,283 with respect to the 1991 transfers and some $3,332,000 with respect to the 1992 transfers; the Trust sought a refund of the additional gift taxes in the amount of some $118,800 with respect to 1991 transfers and some $304,910 with respect to the 1992 transfers. An identical premise drove the refund claims: the obligation of Armstrong's children to pay additional gift taxes and estate taxes as a condition of the gifts had substantially reduced the value of the gifts and, accordingly, the resulting gift taxes. The IRS disallowed the claims.

The Estate and the Trust then filed suit in the district court for refund of all gift taxes. In addition to arguing that the children's responsibility for additional gift taxes and estate taxes reduced the value of the transferred stock, the Estate and the Trust also alleged that the transfers did not constitute valid gifts and that the encumbrances on the transferred stock greatly diminished the marketability of the stock, rendering it of only nominal value. The Estate and the Trust cast their claims under a variety of legal theories. For example, they contended that the children's obligation to pay additional gift and estate taxes created liens or transferee liability at law, the children's express or implied assumption of Armstrong's obligations reduced the stock's value, and the stock transfers were incomplete. The taxpayers even alleged, remarkably, that Armstrong had retained the power to revoke the transfers "by refusing to accept heroic measures and procedures for prolonging his life or by otherwise acting, or refusing to act, in a manner calculated to eliminate his chances of surviving for three years" after the stock transfers.

A magistrate judge recommended that the district court either dismiss or grant summary judgment to the Government on each of the taxpayers' claims. After the Estate and Trust filed timely objections to this recommendation, the district court conducted a careful *de novo* review. The court first determined to dismiss two of the taxpayers' claims for lack of subject matter jurisdiction because the claims had not been presented in the administrative proceeding. *See* 26 U.S.C.A. 7422(a) (West 1989); 26 C.F.R. § 301.6402-2(b)(1) (2001) (requiring the basis for all tax refund suits in federal court to be timely presented first to the IRS). Specifically, the court dismissed the argument that the tax consequences of the gifts had eliminated the market for the stock, as well as the taxpayers' efforts to deny that the gifts were ever

made, declaring that the taxpayers' "own unwavering reference to the transfers as gifts through the refund claim process" and their "failure to assert in the administrative claim the ground that there was no valid gift" or that the stock had no value was fatal to their ability to make such claims in the current action.

The district court then recognized that the validity of all of the taxpayers' remaining contentions rested on determination of whether the donee children's asserted obligations to pay additional gift and estate taxes reduced the value of the National Fruit stock at the time of the transfers. The court concluded that the donees' asserted obligations did not reduce the value of the transferred stock, and that the net gift rules did not apply, and therefore granted summary judgment on the remaining claims to the Government. The Estate and the Trust appeal. We review the district court's grant of summary judgment *de novo*. *Miller v. AT&T Corp.*, 250 F.3d 820, 830 (4th Cir. 2001).

II.

Resolution of this appeal requires that we determine whether the donee children's asserted obligation to pay additional gift taxes and estate taxes associated with the 1991 and 1992 transactions reduced the value of Armstrong's gifts to them at the time of the stock transfers.

The Internal Revenue Code generally imposes a gift tax on property, excluding certain minimal amounts, *see* 26 U.S.C.A. § 2503(b) (West 1989), that an individual transfers as a gift during any tax year. 26 U.S.C.A. § 2501(a)(1) (West 1989). When property is given, the tax is based on its value at the time of the transfer. 26 U.S.C.A. § 2512(a) (West 1989). By statute, the donor is responsible for payment of the gift tax, 26 U.S.C.A. § 2502(c) (West 1989), but a donee may contractually assume liability for the donor's gift tax obligations. *See, e.g.*, *Diedrich v. Comm'r*, 457 U.S. 191 (1982); Rev. Rul. 75-72, 1975-1 C.B. 310 (1975); Rev. Rul. 80-111, 1980-1 C.B. 208 (1980).

When a donee agrees to pay the donor's gift tax obligations as a condition of receiving the gift, the donee need only pay gift taxes on the net gift. Rev. Rul. 75-72. The net gift is determined by deducting the amount of the gift tax obligation from the value of the transferred

property. *Id.* The rationale for the net gift doctrine is that a donor who has required the donees to pay gift taxes on transferred property "did not intend that the amount of the value of the property necessary for the gift tax liability would be a gift." *Harrison v. Comm'r*, 17 T.C. 1350, 1357 (1952).

Because the value of property at the time of transfer is the basis for calculating the gift tax, a donee seeking the benefit of net gift principles must demonstrate that payment of the gift taxes was a condition on the gift at the time of transfer. Rev. Rul. 75-72. Any obligation of the donee to pay gift taxes that is speculative or illusory evidences that the obligation was not a true condition on the gift at the time of the transfer, and so did not diminish the value of the transferred property, in which case the entire value of the property is a gift subject to gift taxes. *See Robinette v. Helvering*, 318 U.S. 184, 188 (1943) (holding that net gift principles do not apply to "contingent" liability); Rev. Rul. 75-72 (providing that net gift principles require "the resulting [gift] tax . . . actually be paid by the donee or from the subject property").

### A.

The Estate and the Trust initially argue that net gift principles apply to reduce the value of the transferred stock by the amount of additional gift taxes paid by the Trust after Armstrong's death. The taxpayers maintain that the transferee liability agreement required the children to pay these additional gift taxes and this obligation created a "retained interest in the donor and therefore a 'net gift.'"

The first problem with this contention is that the children's obligation to pay the additional gift taxes was both contingent and highly speculative. When a condition on a gift is contingent, the Supreme Court has held that the value of the gift is not to be reduced for gift tax purposes. *See Robinette*, 318 U.S. at 188 (1943) (refusing to allow taxpayer to reduce the tax value of a gift by the value of a "reversionary interest" because the value of the reversion was "contingent").

In the typical arrangement in which "net gift" principles apply — an arrangement that Armstrong and his children specifically rejected — the donor transfers property to the donee on the condition that the

donee pay *all* resulting gift taxes. *See* Rev. Rul. 75-72. In such a situation, there is no dispute that the donee is liable for the gift tax, even if the total amount of the tax is not determined until a later juncture. *See, e.g.*, *Harrison*, 17 T.C. at 1353-54, 1356 (recognizing donee's ability to deduct additional gift taxes due under statement of deficiency in calculating net gift). Here, however, Armstrong's children only had an obligation to pay additional gift taxes in the event of an undervaluation of the transferred property, an event all parties sought to avoid by careful valuation of the stock and adequate funding of the Trust. In fact, the children fully expected and intended, according to the counsel who advised them with respect to the 1991 and 1992 transactions, that they were protected "from having to pay taxes and expenses incurred as a result" of the transactions. Because the donees' obligation to pay additional gift taxes was premised solely on undervaluation, a probability no one expected to arise, the obligation was contingent and too speculative to justify application of net gift principles.

Moreover, even were we to hold that the donee children's obligation to pay the additional gift taxes was not speculative, the Estate and the Trust would not be entitled to a refund because of gift taxes paid based on net gift principles. This is so because in addition to being contingent, the children's obligation to pay the additional gift taxes was illusory.

In fact, the Trust — the same entity that paid the initial gift taxes — paid the additional gift taxes. Furthermore, as the Estate and Trust concede, the Trust paid the additional gift taxes "pursuant to the terms of the Grantor Trust," which Armstrong established coincident with the stock transfers. That the terms of the grantor trust agreement provided for the payment of the additional gift taxes, and the Trust in fact paid them, renders unpersuasive the taxpayers' contention that the transferee liability agreement created a true obligation on the children to pay the additional gift taxes.

The taxpayers would have us credit the terms of the transferee liability agreement (imposing liability for additional gift taxes on the donee children), ignoring not only the contrary provision of the grantor trust agreement (imposing this same liability on the Trust), but also the reality that the Trust in fact paid the additional gift taxes

and the donee children have paid no gift taxes. This we will not do. *See Seward's Estate v. Comm'r*, 164 F.2d 434, 436-37 (4th Cir. 1947) ("Taxation . . . is a practical matter and in this field the courts will not be bound by legal refinements in the literal interpretation of contracts when there is evidence that they do not express the real intent of the parties. . . . [T]he practical interpretation placed upon a contract by the subsequent acts of the parties themselves may be taken into consideration."). As a practical matter, the children obtained the full value of the stock transfers because their father established a trust charged with paying the gift taxes on these transfers and that Trust in fact paid the gift taxes, thus belying the suggestion that the children obtained only a net gift.

The taxpayers attempt to avoid this conclusion by arguing that the Trust's payment of the gift taxes constituted payment by the children because the Trust was established by the children and for their benefit.[2] The undisputed facts belie this characterization. First, the very title of the Trust — the "Frank Armstrong, Jr. Trust for the Benefit of Frank Armstrong, Jr." — demonstrates that it was created for the benefit of Armstrong, not his children. Second, the written terms of the trust agreement entirely accord with its title — Armstrong is the named donor and sole beneficiary during his life. Third, Armstrong funded the Trust with his own property, which did not originate with or even pass through the hands of the children. Fourth, except for the $40,000 in gift taxes paid by Armstrong himself, the Trust paid all of the gift taxes attributable to the gifts made by Armstrong, as donor. Fifth, the donee children specifically consented to "go[ing] forward with the transaction[s] on Armstrong's terms" after weighing the potential benefits against what they knew were substantial risks. In sum, tax

---

[2]In support of this argument, the Trust and the Estate also contend that the 1991 and 1992 transactions, including the establishment of the Trust, were carried out in lieu of inheritances the children would have received under Armstrong's will. This contention does not assist them in any way. "[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not . . . and may not enjoy the benefit of some other route he might have chosen to follow but did not." *Comm'r v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974) (citations omitted).

payments by the Trust were not in any way actually payments by the children.

We conclude that the children's obligation to pay additional gift taxes was both speculative and illusory and did not reduce the value of the stock transferred to them.

B.

As the second basis for their claim that the transferred stock was worth less than $109 a share at the time of the transfers, the Trust and Estate make the corollary argument that net gift principles should reduce the value of the gifts by the amount of estate taxes the children are obligated to pay on the gift taxes.

The Estate was assessed estate taxes on the gift taxes paid in connection with the 1991 and 1992 transactions because Armstrong died within three years of making the gifts. *See* 26 U.S.C.A. § 2035(c) (West 1989). The Internal Revenue Code's "gross-up" rule requires that the taxable estate include the value of gift taxes paid on gifts made within this three-year period. *Id.* Where, as here, an estate is insolvent or otherwise unable to pay the estate taxes on prior gift taxes, the Code imposes personal liability for the estate tax on the donees of the gifted property in the amount of the value of the gift received. 26 U.S.C.A. § 6324(a)(2), (b) (West 1989). The taxpayers contend that net gift principles should reduce the stock's value by the amount of estate taxes attributable to the gift taxes that the children may be called upon to pay because the children entered the transactions knowing that Armstrong "retained insufficient assets with which to pay such estate taxes and by implication from the circumstances surrounding the gifts, [Armstrong] attached payment of such estate taxes out of the transferred property as a condition of the transfer."

In *Murray v. United States*, 687 F.2d 386 (Ct. Cl. 1982), the court considered and rejected a similar contention. The *Murray* court reasoned that although the donees were obligated to pay the donor's estate tax liability, "which could reduce the value of the gifts . . . the assumed obligation was not itself susceptible to valuation at the date of the gifts because the economic burden of paying this tax was then unknown." *Id.* at 394. Relying on facts for all relevant purposes iden-

tical to those at hand — that the value of the challenged item would not have been included in the estate if the donor had lived beyond three years from the date of the gift and that the value of the estate could have diminished over time — the court concluded that the potential estate tax liability was too "highly conjectural" to justify a reduction in the value of the gift. *Id.*

We find the *Murray* reasoning persuasive and adopt it here to conclude that the children's estate tax liability was too speculative to reduce the value of the gifts at the time of the 1991 and 1992 transactions. Had Armstrong lived a short time longer than he did, none of the gift taxes would have been included in the value of his taxable estate. Indeed, over time, the value of the estate might not have reached the threshold at which estate taxes are imposed, particularly since the 1991 and 1992 transactions divested Armstrong of substantial property.[3] Moreover, there is no evidence that the children agreed to pay the resulting estate taxes — in the event there were any — as a condition of the stock transfers. Rather, the evidence instead shows that they intended to be protected from any tax liability stemming from the transfers. On the advice of counsel, the children refrained from entering any written agreement to assume liability for estate taxes, and any liability they do have arises only by law because of the estate's insolvency. The litigation attempts of the Estate and the Trust to quantify through expert calculations the value of potential estate taxes at the time of the transfers is irrelevant. What is relevant is that the children's obligation to pay any estate taxes was then "highly conjectural," *Murray*, 687 F.2d at 394, and so provides no ground for applying net gift principles.

## III.

Because we conclude that net gift principles do not apply to reduce the value of the transferred stock by the amount of additional gift

---

[3]The Estate and the Trust attempt to create a ground for reversal by challenging the district court's failure to find, under state law, that Armstrong "relinquished dominion and control so as to result on [*sic*] a gift." Given the repeated assertions of the Estate and the Trust that Armstrong "divested himself of all stock" through the 1991 and 1992 transactions, the district court did not err.

taxes or the estate taxes attributable to the gifts, the Estate and the Trust are not entitled to a refund of the gift taxes paid. Accordingly, the judgment of the district court is

*AFFIRMED*.